2003 ND 45

**Douglas B. MORRIS, Petitioner and Appellee**

v.

**JOB SERVICE NORTH DAKOTA, Respondent and Appellant.**

**No. 20020258.**

Supreme Court of North Dakota.

March 26, 2003.

Constance N. Hofland (argued) and Patrick J. Ward (on brief), Zuger Kirmis & Smith, Bismarck, ND, for petitioner and appellee.

Kevin McCabe (argued), Assistant Attorney General, and Douglas A. Bahr (appeared), Solicitor General, Attorney General's Office, for respondent and appellant.

SANDSTROM, Justice.

[¶ 1] Job Service North Dakota appealed from a district court order reversing its decision disqualifying Douglas B. Morris from unemployment benefits. We conclude Job Service correctly ruled that Morris's past employers contributed to his pension, thus disqualifying him from unemployment benefits under the circumstances. We reverse the district court order and reinstate Job Service's decision.

I

[¶ 2] Morris, a member of Ironworkers Local Union No. 793, retired effective January 1, 2002, and began receiving $479 per week from the Ironworkers Union pension fund. On January 10, 2002, Morris filed a claim with Job Service and began receiving unemployment benefits in the amount of $290 per week. Job Service later found that the money in Morris's pension was derived from direct contributions from his past employers, and, under N.D.C.C. § 52–06–02(15), deducted the amount of Morris's pension from his job insurance benefits. Because the $479 weekly pension amount exceeded Morris's $290 weekly unemployment benefits, Job Service ruled Morris was ineligible for any benefits.

[¶ 3] Morris requested reconsideration, and the matter was heard by an appeals referee. The appeals referee rejected Morris's claim that the payments made to the pension fund were his contributions rather than his employers' contributions, and affirmed Job Service's initial determination. After Morris requested review, Job Service affirmed the appeals referee's decision. Morris appealed, and the district court reversed Job Service's decision disqualifying Morris from unemployment benefits, concluding the pension account was funded by employees' money rather than by contributions from Morris's employers.

[¶ 4] Morris's appeal from Job Service's decision to the district court was timely under N.D.C.C. § 52–06–27. The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 52–06–27. Job Service's appeal to this Court from the district court order, which was followed by a subsequently entered consistent judgment, see DeCoteau v. Nodak Mut. Ins. Co., 2001 ND 182, ¶ 1 n. 1, 636 N.W.2d 432, was timely under N.D.C.C. § 52–06–27 and N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 52–06–27.

II

[¶ 5] Under N.D.C.C. § 28–32–46, the district court must affirm an order of an administrative agency unless it finds any of the following are present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

On appeal from a district court ruling on an administrative decision, this Court reviews the agency order in the same manner. *See* N.D.C.C. § 28–32–49. Questions of law, including the interpretation of a statute, are fully reviewable on appeal from an administrative decision. *Grand Forks Prof'l Baseball, Inc. v. North Dakota Workers Comp. Bureau,* 2002 ND 204, ¶ 8, 654 N.W.2d 426.

**A**

[¶ 6] The unemployment compensation program is a joint federal-state system in which each state receives federal funds and administers the program. *See* 26 U.S.C. §§ 3301 through 3311; N.D.C.C. chs. 52–02 through 52–08.1; *Teledyne Columbia–Summerill Carnegie v. Unemployment Comp. Bd. of Review,* 160 Pa. Cmwlth. 17, 634 A.2d 665, 669 (1993). Because some states allowed retired individuals who received social security or public or private pensions to receive unemployment insurance benefits even though they actually had withdrawn from the labor force, Congress in 1976 enacted the Federal Unemployment Tax Act, 26 U.S.C. § 3304(a)(15), to require all states to offset an individual's unemployment insurance compensation by the amount of any public or private pension or other similar periodic retirement payment based on the individual's previous employment. *See Watkins v.* *Cantrell,* 736 F.2d 933, 937 (4th Cir.1984). The pension offset requirements of the federal statute apply only if "such pension, retirement or retired pay, annuity, or similar payment is under a plan maintained (or contributed to) by a base period employer or chargeable employer (as determined under applicable law)." 26 U.S.C. § 3304(a)(15)(A)(i). The Act allows states to "provide for limitations on the amount of any such a reduction to take into account contributions made by the individual for the pension, retirement or retired pay, annuity, or other similar periodic payment." 26 U.S.C. § 3304(a)(15)(B).

[¶ 7] In accordance with the federal requirements, the Legislature enacted N.D.C.C. § 52–06–02(15), which disqualifies an individual from receiving unemployment benefits "[f]or any week with respect to which an individual is receiving a pension ... under a plan maintained or contributed to by a base-period or chargeable employer, as determined under applicable law...." Under N.D.C.C. § 52–06–02(15)(c), an individual's weekly benefit amount will be reduced "by no part of the pension if the entire contributions to the plan were provided by such individual, or by the individual and an employer, or any other person or organization, who is not a base-period or chargeable employer, as determined under applicable law...."

[¶ 8] Job Service does not contend Morris's former employers "maintained" the Ironworkers Union pension fund. Morris does not contend his former employers were not "base-period or chargeable" employers under the law. Therefore, the issue in this case is whether Morris's employers "contributed to" the pension fund, or whether Morris himself made the "entire contributions to the plan." We agree with the court in *Edinger v. State Employment Sec. Dep't,* 58

Wash.App. 525, 793 P.2d 1004, 1006 (1990), that this inquiry presents a mixed question of fact and law. Our review of a mixed question of fact and law involves a determination of whether the evidence supports the agency's findings of fact and, in turn, whether those findings of fact sustain the agency's conclusion. *Hulse v. Job Service North Dakota,* 492 N.W.2d 604, 606 (N.D. 1992). In reviewing the agency's findings of fact, we determine only whether a reasoning mind could have reasonably decided the findings of fact were proved by the weight of the evidence. *Hjelden v. Job Service North Dakota,* 1999 ND 234, ¶ 6, 603 N.W.2d 500.

**B**

■■■ [¶ 9] Although N.D.C.C. § 52–06–02(15) is silent on who has the burden of proof on the issue, we conclude the burden of establishing that a pension should not be used to offset unemployment benefits properly rests with the claimant. In *Lambott v. Job Service North Dakota,* 498 N.W.2d 157, 159 (N.D.1993), this Court held that a claimant has the burden of establishing good cause for failing to apply for or accept suitable work under N.D.C.C. § 52–06–02(3). We reasoned that "[t]his interpretation places the burden on the party with particular knowledge of the claimed underlying facts." *Lambott,* 498 N.W.2d at 159. We said a contrary interpretation would lead to an absurd result because it "would place on Job Service the burden of proving the negative—the existence or non-existence of unknown facts." *Id.* Likewise, in this case, the claimant is the party with the knowledge of whether the claimant or the claimant's employer contributed to the claimant's pension. *See also Edinger,* 793 P.2d at 1006 (noting Washington administrative rule creates presumption of no employee contribution unless claimant provides satisfactory evidence that such a contribution was made).

Consequently, to avoid the offset provisions of N.D.C.C. § 52–06–02(15), Morris has the burden of establishing that he, rather than his employers, contributed to the pension.

**C**

[¶ 10] Morris presented evidence that the Ironworkers Union and Associated General Contractors of North Dakota signed an agreement on April 4, 2000, as the result of negotiations over increased wages for a three-year period. The negotiations involved only a total dollar amount, and the members of the Ironworkers Union annually decided how much of the negotiated wage increase would be distributed to their pension, annuity, union health and welfare fund, ironworkers trade association, apprenticeship fund, and union dues. Article X of the agreement provides in part:

> *The Employer agrees to contribute and forward every month,* not later than the 15th day of the following month, hereinafter called the "due date", *such sums for pension,* health and welfare, apprentice and I.I.I. funds, plus the deductions from the Basic Wage for working assessment contributions, for each hour worked by all employees covered by this Agreement. The Funds shall be known separately as the Iron Workers Local 793 Supplemental Pension Fund (Annuity Fund), Duluth Building Trades Welfare Fund, Iron Workers Local 793 Apprentice Fund, I.I.I. Fund, Working Assessment Fund and Iron Workers Local 793 Trust Funds under separate Trust Agreements to which the Employer is automatically bound. The Fund's Trustees shall equally represent the Union and the Employer.

(Emphasis added).

[¶ 11] Gary Nelson, the business manager for the Ironworkers Union, testified as follows:

MR. CLINTON: Well, who funds the pension, I guess that's what we're looking at, Gary.

MR. NELSON: Well, the cont[r]actor does, but, but, we tell them how to fund it. That's what I'm saying, you know, they give us only so much.

MR. CLINTON: Yeah, I understand, I understand that, but I'm more interested in terms of the funding. So, the funding for this benefits [sic] comes from the employer?

MR. NELSON: Cuz, we tell them, instead of putting a dollar in our own pocket and going out there and buying an IRA or 401K or something like that. We go, we, we've did it this way, we go out there and we tell the employer we're gonna give you $.50 of that dollar back and you go ahead put that $.50 in the pension for us, you know, instead of us doing it on our own. So, what I'm trying to, trying to get across here is that the contractor don't put that $.50 or that dollar or this $2.69 total that it is now, they don't do that now because they are a good contractor, they are doing that because Local 793's members ...

MR. CLINTON: They have to pay it.

MR. NELSON: requested them to do that.

Nelson also testified, "we directed to have the contractor put it in because of the tax savings...." Nelson explained that income taxes are not paid on the amount of the contributions at the time the contributions are made, but members are taxed when they begin drawing their pensions. Nelson also testified, "to get vested in Local 793 pension, you have to work a minimum of 400 hours a year for five years in a row." Morris did not offer in evidence the Trust Agreement for the pension fund.

[¶ 12] Based on the language of the agreement stating that the "Employer agrees to contribute" to the pension fund,

and Nelson's testimony that the "contractor" funds the pension, Job Service determined that Morris's employers, rather than Morris himself, contributed to the pension. Morris argues the Ironworkers Union's request to the contractors, made independently of the collective bargaining agreement, to make payments from union members' paychecks to the pension does not transform the contributions into employer contributions. Morris contends union members exercise complete discretion over the distribution of their wages, the employer acts as a mere conduit for the payments, and therefore union members contribute to the pension fund. Morris acknowledges, the discretion is exercised collectively, not by the members individually. Job Service's decision rejecting this contention is consistent with the decisions of most courts that have addressed the issue. *See Belmont v. State, Dep't of Labor,* 745 P.2d 75 (Alaska 1987); *Cardarelli v. Dep't of Employment and Training,* 674 A.2d 398 (R.I.1996); *Edinger,* 58 Wash. App. 525, 793 P.2d 1004.

[¶ 13] In *Belmont,* 745 P.2d at 76, the court rejected a similar argument that "the entire amount of [a claimant's] Teamsters pension is not attributable to his employer, because his employer contributed the funds to the union trust fund pursuant to direction from employees under a collective bargaining agreement." The court relied on language from the pension trust handbook stating, " 'This Plan is funded through employer contributions, the amount of which is specified in the Collective Bargaining Agreements. Contributions by employees are not required nor are they permitted.' " *Id.* at 77. The court reasoned the offset statute "does not make a distinction for amounts contributed as pension plan payments pursuant to a collective bargaining agreement," and "[t]here is no question that Belmont's em-

ployer made the contributions to the pension plan." *Id.* at 78.

[¶ 14] In *Cardarelli*, 674 A.2d at 401, the court rejected a claimant's argument that employee contributions to a pension fund can include other benefits that were given up to fund a pension:

The record before us yields no evidence to show that the employee contributed to his pension fund in any way. The plaintiff's pension plan was a result of a collective-bargaining agreement between his union and a former employer. In the instant case, as the trial judge noted, the plaintiff did not make any direct, out-of-pocket contribution to his pension plan. The trial judge stated that "[a] worker who gives up other items, such as pay increases, improved health coverage, extra vacation days, can be deemed to have contributed to a pension." We find that there was no direct evidence in the record to show that the plaintiff did in fact contribute to his pension fund. Given the lack of evidence, we are of the opinion that the trial judge erroneously concluded that the plaintiff had "contributed [to his pension] in that other benefits were given up to obtain the pension."

The court refused to interpret the offset statute to include nonmonetary contributions to a pension fund. *Id.*

[¶ 15] In *Edinger*, 793 P.2d at 1007, the court ruled contributions to a union pension fund were made solely by the employer when the collective bargaining agreement provided the pension plan would be "employer funded," the money flowed directly from the employer to the pension fund, and a letter from the trust manager stated, "direct contributions from the employee cannot be accepted." The court said:

We note that as a result of the collective bargaining agreement, the employer does not pay unemployment insurance taxes on "non wage" moneys designated for pension funds. *See* RCW 50.04.330. Thus, more unemployment insurance tax is paid on behalf of nonunion workers whose entire compensation is taxable wages. This makes it more desirable for the employer to hire union workers. In addition, the union worker receives an income tax deferment on pension moneys.

*Id.* at 1007 n. 3.

[¶ 16] Morris relies on *Ehman v. Unemployment Comp. Bd. of Review*, 776 A.2d 1031 (Pa.Commw.Ct.2001), to support the argument that he, rather than his employers, contributed to the pension fund. In *Ehman*, a union and an employer agreed that a previously negotiated cost-of-living adjustment of $0.33 per hour, which union members began receiving effective May 1, 1999, would not be paid to the employees as wages after August 1, 1980, but part of it would be used to increase the pension benefits of past and future employees. *Id.* at 1033. The court ruled that "under the unusual facts of this case [the claimant] is properly regarded as having contributed to his pension." *Id.* at 1036. The court reasoned:

[T]he situation was untypical ... [N]ever before and never since had the Union negotiated the give back of a particular adjustment with a set monetary value ... This was different from swapping inchoate proposals during bargaining. In a very real sense, Employer acted as a conduit to funnel money that otherwise would have gone directly into employee's paychecks into the pension fund and other benefit programs, as is reflected in the Board's language that a "reallocation of part of the monies claimant would have received was redirected to the Pension Plan."

*Id.* (footnote omitted).

[¶ 17] We do not find *Ehman* persuasive under the circumstance of this case.

The court in *Ehman,* 776 A.2d at 1033, emphasized "the unusual facts of this case ..." The court viewed the situation before it as "untypical" because the employees were already receiving the cost-of-living adjustment that was later redirected to the pension fund after new union negotiations. *Id.* at 1036. The court interpreted this situation as a "give back" of money the employees had actually been receiving as wages. *Id.* In this case, there is no similar "give back" of wages Morris had actually been receiving to fund the pension. If we were to apply the reasoning of *Ehman* to a typical collective bargaining situation, Job Service would be required to investigate the true nature of an employee's wages beyond the actual terms of every collective bargaining agreement, because employers are assessed unemployment taxes based only on a percentage of "wages" paid to employees. N.D.C.C. § 52–04–03. We are not convinced the *Ehman* court would have ruled the employee contributed to his pension absent the actual "give back of a particular adjustment with a set monetary value." *Ehman,* 776 A.2d at 1036.

[¶ 18] In any event, *Ehman* was recently overruled in *United States Steel Corp. v. Unemployment Comp. Bd. of Review,* 2003 WL 751184, *11, 2003 Pa. Commw. Lexis 110, *36 (Pa.Commw.Ct. March 6, 2003). The court in *United States Steel* said, "[b]ased upon review of the statutory framework, caselaw from other jurisdictions, as well as the record in the case *sub judice,* it is now apparent that the difficulties of proof in allowing pension offset decisions to be guided by collective bargaining negotiations renders the *Ehman* doctrine unworkable from a practical standpoint." *Id.* at *10, 2003 Pa. Commw. Lexis 110, *30. Because "the *Ehman* analysis, which requires this much in-depth consideration of the events occurring decades ago, is at odds with the purpose of the Law," the court said, "we expressly overrule *Ehman* and now hold that, in order for employees to receive only a 50% pension offset, there must be a line-item deduction appearing on the pay stub or a specific provision in the pension plan indicating a contribution to the pension fund has been made by the employee." *Id.* at **10, 11, 2003 Pa. Commw. Lexis 110, **31, 36.

[¶ 19] The agreement in this case states the "Employer agrees to contribute" to the pension. The union's business manager testified the "contractor" funds the pension. The employers send the money to the pension fund. Section 52–06–02(15), N.D.C.C., does not distinguish between amounts contributed to a pension fund by an employer and amounts contributed to a pension fund by an employer under the directives of a collective bargaining agreement. Morris's taxes are deferred on the amount contributed to the pension, and employees must work a minimum number of hours a year for five years in a row to vest in the pension fund. These circumstances are indicative of an employer-funded pension plan. Morris presented no evidence that he made any out-of-pocket contributions to the pension fund or that he was even allowed to do so. Although there is no evidence that Morris was prohibited from contributing to the pension, Morris chose not to offer in evidence the Trust Agreement for the pension fund. We view the absence of evidence prohibiting Morris from contributing to his pension as merely another factor for Job Service to consider along with all of the other evidence.

[¶ 20] We conclude a reasoning mind could have reasonably found from the weight of the evidence that Morris's employers, rather than Morris himself, contributed to the union pension fund within the meaning of N.D.C.C. § 52–06–02(15),

and this finding supports Job Service's decision that Morris is disqualified from receiving unemployment benefits under the circumstances.

### III

[¶ 21] We reverse the district court order and reinstate Job Service's order.

[¶ 22] VANDEWALLE, C.J., and NEUMANN, MARING and KAPSNER, JJ., concur.