Filed 2/26/13 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2013 ND 24

Gayln L. Olson, Bradley L. Nelson, Rebecca L. Harstad, 

Keith Abrahamson, Joann Allard, Deborah A. Ambuehl, 

Gertrude E. Anderson, Robert Anderson, Paul Anderson, 

Randy Anderson, Billy Balstad, Matthew A. Barker, 

James Beach, Daniel Beck, Jon Bedard, Daniel W. Beine, 

Brian Berg, Brenda K. Berg, Steven Bergland, Otto P. 

Bertsch, Julie Bjorklund, Craig Black, Vernon Blazejewski, 

Daniel Bloomquist, Evelyn Boeddeker, Mark Boeddeker, 

Sandra Bratlie, Marlene Bratlie, Michael Bratlie, 

Steven M. Breiland, Kristine L. Brisky, Lawrence Brosius, 

Monty H. Brown, Dan Bueckers, Tracy R. Burdette, Brent 

Butenhoff, William Carlin, Sharon M. Chamberlain, Lee 

Christensen, Scott R. Christie, Dale Clausen, Michael Cull, 

Darlyne Dahl, Paul Dahlman, Christopher Davis, Mark De Moss, 

Donovan Donarski, Gary Donarski, Daniel L. Dumas, 

Lynette R. Eberhardt, Rollin Eberhardt, Marvin Eberhardt, 

Lance Eide, Milton Elhard,Steve Eliason, Rodney Englund, 

Richard A. Erstad, Marvin Erstad, Ann Fettig, Thomas M. Fischer, 

Harold Fischer, Richard A. Flieth, Renae M. Fredrickson, 

Lynn Fredrickson, Jade Fredrickson, Terry Fredrickson, 

Michael M. Frey, Douglas Fugleberg, Morris Gilbertson, 

Earl Gorsuch, Meridith Gozdal, Todd Gozdal, Russell Grandstrand, 

Roger Gratton, Brian Gunderson, Gerald Gunkel, Timothy Gunnerson, 

Tim W. Gust, William Haines, Michael Haley, Michael Halstad, 

Tracy Hampson, Christian Hanson, Paul Hanson, Debra Hatton, 

Scott Haux, Doyle Heden, Alecia Heiser, Jason Hermanson, 

Mark Hermanson, Cheryl Heuer, Jerome A. Higdem, Theodore Hilton, 

Ryan Hjelmstad, Terry Holm, M. Kent Holmberg, Wayne Homstad, 

Wayne Horge, Brian Hoyt, Bruce Jacobson, Barbara Jensen, 

Earl Jensen, Michael Johnson, Harlan Johnson, David Jorgenson, 

Dean J. Kahl, Rory Kale, Sharon Kalka, Brian Karboviak, Neil Keena, 

Joyce Keller, Stephen Kissee, Ann M. Klemetson, Tommy D. Klemetson, 

Fred Kloster, James W. Knecht, Ross Knudsvig, Andrea Knutson, 

Luther Koapke, Andrew Korczak, Conrad Kostrzewski, Randy Kowalski, 

Joe Kulwicki, David Kuznia, Debra Kuznia, Dion Larson, James Larson, 

Jeanette M. Lee, Ronald Lee, Gregory Lefrotth, Jeremy Littlejohn, 

Carl Lizakowski, Mike Lorenson, Christopher Lyng, Jose Martinez, 

Kyle Matti, Duane Mcritchie, Gary Melland, Tim Meshefski, 

Cindy L. Meyer, Katherine J. Mickelson, Priscilla Midboe, 

Deanna Middleton, Timothy D. Miller, Daniel Miller, Donna Miller, 

John P. Mooney, Tami Mooney, Jennifer Mooney, Dorsey Moss, 

Ben D. Mulder, Jeffery L. Nelson, Toni Nelson, Dwight Nelson, 

Wayne Netterlund, Neomie Nielsen, Jason Nordine, Larry Olson, 

Bradley Olson, Robert Olson, Bruce Osowski, Tom Pacholke, 

Curtis Parker, Holly Passa, Matthew Passa, Jordan Patterson, 

Ellen Patterson, Darin Pederson, Daniel Pelletier, Craig Petersen, 

Larry Pederson, Dave Pokrzwinski, Pauline Pokrzwinski, Rodney Puppe, 

Tammy Puppe, Silas Rawls, Mary J. Remore, Rodney Remore, Rodolfo 

Reyes, Nathan L. Rham, Brian Rice, Eric Rice, Robert Robinson, 

Stacy L. Agnew (Rogers), Dwight Rost, Christopher Rost, Paul Rue, 

Gary Sailor, Kari Sailor, Mike S. Sayler, Yvonne Schmaltz, John Schnellbach, 

James Schreiner, Richard Sheppard, Monroe Siebels, Julie A. Simonson, 

Mike Sink, Deborah M. Sinner, Larry G. Sinner, Timothy Sorteberg, 

Charles Spicer, Linda Staskivige, Donald Staskivige, Lisa Staskivige, 

Chad Strand, Bradley Stuart, Robert Sundby, Margaret Sundeen, Jean Swenson, 

Todd Swenson, Thomas Taber, Richard Tastad, Brad Tastad, Brian Tastad, 

Billie Teegarden, Richard Teegarden, Rick Tessin, Mari J. Thomson, 

Jason R. Thomson, Robert Torkelson, John Tostrup, Sheryl Tostrup, 

Jason G. Trosvig, Justin Tufte, Larry Waldal, Anthony A. Wanbach, 

Dorene K. Wanbach, Donald Waters, John Wellman, Derek Wetzel, 

Howard Wieber, Chad Wildeman, Dennis Wilebski, Barbara 

Willison, Paul Woinarowicz, Appellants

v.

Job Service North Dakota and American Crystal Sugar Company, Appellees

No. 20120250

Appeal from the District Court of Traill County, East Central Judicial District, the Honorable Steven L. Marquart, Judge.

REVERSED AND REMANDED.

Opinion of the Court by Kapsner, Justice.

Daniel E. Phillips, 1123 5th Avenue South, P.O. Box 1897, Fargo, ND 58107-

1897, for appellants.

Michael T. Pitcher, Assistant Attorney General, Office of Attorney General, 500 North 9th Street, Bismarck, ND 58501-4509, for appellee Job Service North Dakota.

Paul J. Zech, 220 South 6th Street, Suite 2200, Minneapolis, MN 55402-4504, for appellee American Crystal Sugar Company.

Olson v. Job Service

No. 20120250

Kapsner, Justice.

[¶1] Claimants appeal a district court judgment affirming Job Service North Dakota’s decision denying them unemployment benefits.  Because the plain language of N.D.C.C. § 52-06-02(4) only disqualifies claimants from unemployment compensation for employee initiated work stoppages due to a labor dispute, it does not apply to the locked out Claimants.  We reverse the district court’s judgment affirming Job Service’s benefit denial and remand to Job Service for proceedings consistent with this opinion.

I

[¶2] Claimants are bargaining unit employees of American Crystal Sugar’s (“ACS”) North Dakota facilities and are represented by various local unions of the Bakery, Confectionary, Tobacco Workers and Grain Millers Union (“Unions”).  During the summer of 2011, the Unions and ACS were engaged in contract negotiations for a successor agreement.  The Unions and ACS were unable to reach a settlement, and on July 28, 2011, ACS made its final contract offer.  The Unions rejected the offer.  On August 1, 2011, ACS locked out its bargaining unit employees and began using replacement workers.  Claimants applied for unemployment compensation.  Job Service determined Claimants were disqualified from benefits because they were “unemployed due to a labor dispute” under N.D.C.C. § 52-06-02(4), which precludes unemployment compensation if “the individual’s unemployment is due to a strike, sympathy strike, or a claimant’s work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises . . . .”  The claims were consolidated under N.D.C.C. § 52-06-20, and Claimants appealed the decision to an appeals referee.  The referee affirmed the benefit denial, stating:

It is reasoned that the claimants are unemployed due to a labor dispute . . . . Subsection 52-06-02(4) [precludes compensation for] unemployment . . . due to a “strike, sympathy strike, or a claimant’s work stoppage dispute of any kind.”  The phrase “of any kind” suggests that the Legislature intended for a liberal rather than a narrow interpretation of a “claimant’s work stoppage dispute.”  This would include lockouts, even where the individual was willing to continue to work or has offered to return to work under the same terms and conditions of the collective bargaining agreement.

Claimants requested Job Service review under N.D.C.C. § 52-06-19, and the request was denied.  Claimants then petitioned the district court for review of the benefit denial.  The district court affirmed, concluding the statutory language clearly and unambiguously shows Claimants “are not entitled to unemployment benefits because of their unemployment due to a lockout.”

II

[¶3] Under N.D.C.C. § 28-32-46, a district court must affirm an administrative agency order unless:

1.  The order is not in accordance with the law.

2.  The order is in violation of the constitutional rights of the appellant.

3.  The provisions of this chapter have not been complied with in the proceedings before the agency. 

4.  The rules or procedure of the agency have not afforded the appellant a fair hearing. 

5.  The findings of fact made by the agency are not supported by a preponderance of the evidence. 

6.  The conclusions of law and order of the agency are not supported by its findings of fact. 

7.  The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8.  The conclusions of law and order of the agency do not sufficiently explain the agency’s rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

“On appeal from a district court ruling on an administrative decision, this Court reviews the agency order in the same manner.”  
Morris v. Job Serv. North Dakota
, 2003 ND 45, ¶ 5, 658 N.W.2d 345 (citing N.D.C.C. § 28-32-49).  However, interpretation of a statute is a question of law, and this Court reviews questions of law de novo.  
Morris
, at ¶ 5 (citation omitted).

III

[¶4] Our disposition of this case turns on the interpretation of N.D.C.C. § 52-06-

02(4), which states, in relevant part, an employee is disqualified from unemployment benefits when:

[T]he individual’s unemployment is due to a strike, sympathy strike, or a claimant’s work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises . . . .

[¶5] “The primary purpose of statutory interpretation is to determine legislative intent.” 
Teigen v. State
, 2008 ND 88, ¶ 19, 749 N.W.2d 505 (citing 
Estate of Elken
, 2007 ND 107, ¶ 7, 735 N.W.2d 842).  In doing so, “[t]he Legislature’s intent must be sought initially from the statutory language.”  
District One Republican Comm. v. District One Democrat Comm.
, 466 N.W.2d 820, 824 (N.D. 1991) (citation omitted).  “If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute.” 
Stutsman Cnty. v. State Historical Society
, 371 N.W.2d 321, 325 (N.D. 1985) (citations omitted).  “Words . . . in a[] statute are to be understood in their ordinary sense, unless a contrary intention plainly appears . . . .”  N.D.C.C. § 1-02-02. But, if the statute is ambiguous or of doubtful meaning, we may look to extrinsic aids to interpret the statute.  
Teigen
, at ¶ 19; 
District One Republican Comm.
, 466 N.W.2d at 825.

[¶6] On appeal, Claimants argue they are eligible for unemployment benefits because N.D.C.C. § 52-06-02(4) does not apply to locked out employees.  Specifically, they argue “strike, sympathy strike, or a claimant’s work stoppage dispute of any kind,” by plain meaning, refers exclusively to employee initiated work stoppages, excluding employer initiated action such as a lockout.  In support, they argue the rule of 
ejusdem
 
generis
 demonstrates the phrase “of any kind” only refers to additional types of claimant work stoppages related to a labor dispute.  However, ACS and Job Service, under a plain language interpretation, argue the modifier “of any kind” after the phrase “work stoppage dispute” broadens the scope of work stoppages to include lockouts.  ACS argues Claimants’ reliance on 
ejusdem
 
generis
 is misplaced because the rule is used to reconcile incompatibility between specific and general statutory words so all words are given effect and no words are superfluous.  ACS argues N.D.C.C. § 52-06-02(4) contains no incompatibility, and its plain meaning supports Job Service and ACS’s interpretation Claimant’s are disqualified for unemployment compensation.

[¶7] “[U]nder the principle of 
ejusdem
 
generis
, general words following particular and specific words are not given their natural and ordinary sense, standing alone, but are confined to persons and things of the same kind or genus as those enumerated.”  
Resolution Trust Corp. v. Dickinson Econo-Storage
, 474 N.W.2d 50, 52-53 (N.D. 1991) (quotation omitted). In applying the rule of 
ejusdem
 
generis
, “we must keep in mind the admonition that . . . our primary purpose is always to carry out the intent of the legislature.”  
Id.
 at 53 (citing 
Aanenson v. Bastien
, 438 N.W.2d 151, 156 (N.D. 1989)).  “The rule accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words.”  
Resolution Trust
, at 53 (quotation omitted).

[¶8] In 
Resolution Trust
, we interpreted a statute that stated, “[i]f any tax on any real estate is paid by or collected from any occupant or tenant 
or any other person
 . . . such occupant, tenant, or other person may recover by action the amount . . . paid . . . .”  474 N.W.2d at 52 (emphasis added).  The appellee argued the phrase “or any other person” meant “
any
 person could pay the real estate taxes on . . . property and receive a money judgment against the owner or other responsible party.”  
Id.
 (emphasis in original).  We rejected this interpretation because, in addition to the illogical result it created, the rule of 
ejusdem
 
generis
 shows “any other person” refers to “other persons of the same general class as occupants and tenants.”  
Id.
 at 53.  In doing so, we said:

[W]here a statute or other document enumerates several classes of persons or things, and immediately following and classed with such enumeration the clause embraces “other” persons or things, the word “other” will generally be read as “other such like,” so that persons or things therein comprised may be read as ejusdem generis with, and not of quality superior to or different from, those specifically enumerated.

Id.
 (quoting 
Gaustad v. Nygaard
, 64 N.D. 785, 788, 256 N.W. 230, 231-232 (1934)).  Accordingly, we held the statute applied to “occupants, tenants, or other persons with some interest in or connection with the subject property.”  
Resolution Trust
, 474 N.W.2d at 53.

[¶9] Applying that logic in this case demonstrates the phrase “strike, sympathy strike, or a claimant’s work stoppage dispute of any kind” applies exclusively to claimant work stoppages.  The phrase explicitly lists strikes and sympathy strikes as disqualifying conduct.  A strike is a “temporary stoppage of work by the concerted action of two or more employees as a result of a labor dispute.”  N.D.C.C. § 34-08-

01(4); 
see also
 
Black’s Law Dictionary
 1558 (9th ed. 2009) (A strike is “[a]n organized cessation or slowdown of work by employees to compel the employer to meet the employees’ demands . . . .”).  A strike is an employee initiated work stoppage.  A sympathy strike is “[a] strike by union members who have no grievance against their own employer but who want to show support for another union involved in a labor dispute.”  
Black’s
, at 1558.  A sympathy strike, too, is exclusively an employee initiated work stoppage.  In contrast, a “lockout” is “[a]n employer’s withholding of work and closing of a business because of a labor dispute.”  
Id.
 at 1024.  Lockouts are an employer initiated action.

[¶10] Thus, after the statute lists two specific examples of employee initiated work stoppages, it logically follows the next and last phrase, “or a claimant’s work stoppage dispute of any kind,” based on the construction and context of the sentence, refers to additional types of employee initiated work stoppages.  Rather than enumerating a variety of employee initiated work stoppages, the Legislature’s use of the phrase “of any kind,” qualified by “a claimant’s,” expands the types of disqualifying employee work stoppages within the context of the statute.

[¶11] Similar to 
Resolution Trust
, 474 N.W.2d at 53, where “any other person” following a specific class of people refers exclusively to “other persons of the same general class,” this statute’s phrase “of any kind,” by plain meaning, refers to other work stoppages initiated by persons of the same general class: claimants.

[¶12] Furthermore, Claimants assert their interpretation of N.D.C.C. § 52-06-02(4) is clear and Job Service and ACS’s statutory construction renders part of the statute superfluous.  Claimants argue “extending the labor dispute disqualification to locked out employees whose employer has replaced them completely divorces the disqualification from its phrase ‘[a] claimant’s work stoppage dispute.’”  In contrast, ACS argues its statutory interpretation is clear and Claimants’ statutory construction renders part of the statute superfluous, noting: “[I]f the disqualification only applied in the strike context, the phrase ‘of any kind’ would be rendered a nullity.”  Job Service advances a similar argument, expanding on the appeals referee’s determination the phrase “of any kind” supports an interpretation of work stoppage dispute broad enough to include lockouts.

[¶13] “A statute’s language must be interpreted in context, and this Court attempts to give meaning and effect to every word, phrase, and sentence.”  
Holbach v. City of Minot
, 2012 ND 117, ¶ 14, 817 N.W.2d 340 (quotation and citations omitted).  “In enacting a statute, it is presumed . . . [t]he entire statute is intended to be effective.”  N.D.C.C. § 1-02-38(2).  All sections of a statute must be construed to have meaning because “[t]he law neither does nor requires idle acts.”  N.D.C.C. § 31-11-05(23).

[¶14] ACS and Job Service’s statutory construction reads “a claimant’s” out of the statute.  Indeed, if the inclusion of “work stoppage dispute of any kind” broadens “a claimant’s work stoppage dispute of any kind” to include employer initiated work stoppages, the phrase “a claimant’s” becomes superfluous.  Section 52-06-02(4), N.D.C.C., reads “a claimant’s work stoppage dispute of any kind”; it does not read “a work stoppage dispute of any kind.”  ACS and Job Service’s interpretation essentially rewrites N.D.C.C. § 52-06-02(4) to preclude benefits:

For any week with respect to which it is found that the individual’s unemployment is due to a strike, sympathy strike, or work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises . . . .

Under this construction, employees would be disqualified from unemployment benefits for any work stoppage related to a labor dispute.  As illustrated below, this language was initially proposed in the statute’s 1981 amendment; however, it was modified to ensure the 1981 work stoppage amendment applied exclusively to claimant work stoppages.

[¶15] We conclude “a claimant’s work stoppage dispute of any kind” refers exclusively to employee initiated work stoppages, and because a lockout is not an employee initiated work stoppage, N.D.C.C. § 52-06-02(4)’s plain language does not disqualify Claimants from benefits.

IV

[¶16] Though we find the plain language of N.D.C.C. § 52-06-02(4) is clear, the parties advance different, rational plain language statutory interpretations.  Because this meets our definition of ambiguous, we address N.D.C.C. § 52-06-02(4)’s legislative history.  
See
 
State v. Martin
, 2011 ND 6, ¶ 5, 793 N.W.2d 188 (noting “[a] statute is ambiguous if it is susceptible to different, rational meanings”).

[¶17] We begin with the legislative history of the original unemployment compensation statute’s labor dispute provision.  Most states’ unemployment statutes were modeled after the 1935 Social Security Act.  
See
 Milton I. Shadur, 
Unemployment Benefits and the “Labor Dispute” Disqualification
, 17 Univ. Chi. L. Rev. 294, 294-95 (1949-1950).  By 1937, every state had enacted statutes creating qualifying programs and most states, North Dakota included, copied the language from the Federal Act.  
Id.
 at 295.  As originally passed, 1937 N.D. Sess. Laws ch. 232, § 7(c)(2)(d) (codified as amended at N.D.R.C. § 52-0602(4) (1943)), stated, in relevant part, an employee was disqualified for unemployment compensation:

For any week with respect to which the Bureau finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises . . . .

This disqualifying language remained substantively unchanged until 1981.

[¶18] In 1980, in 
Robberstad v. Dir. N.D. Employment Security Bureau
, Burleigh County Civ. Case No. 28570 (1980), on which the dissent relies, benefits were denied based upon the following statutory language:

4.  For any week with respect to which it is found that his [unemployment] is due to a stoppage of work which exists because of a labor dispute . . . provided that this subsection shall not apply if it is shown that:

a.  he is not participating in or directly interested in the labor dispute which caused the stoppage of work; and

b.  he does not belong to a grade or class of workers which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in the dispute . . . .

Robberstad
, at 2 (citing N.D.C.C. § 52-06-02(4)(Supp. 1979)).

[¶19] But the 
Robberstad
 case is not helpful in this matter.  “Work stoppage” may include both strikes and lockouts.  Contrary to the dissent’s assertion at ¶ 50, 
Robberstad
 did not hold that work stoppages or stoppages of work encompass both stoppages because of strikes and stoppages because of lockouts.  Rather, the issue in 
Robberstad
 was “whether or not a ‘lockout’ is a 
labor dispute
 for purposes of unemployment insurance benefits.”  
Robberstad
, at 1 (emphasis added).  After the 
Robberstad
 decision, the legislative assembly in 1981 specifically modified the statutory language to be “claimant’s work stoppage” to distinguish between stoppages initiated by the person seeking benefits and those initiated by the employer.  It is presumed the legislature does not engage in idle acts.  N.D.C.C. § 31-11-05(23).

[¶20] In 1980, union employees at Amoco Oil Company in Mandan went on strike.  
See
 
Amoco Oil Co. v. Job Serv. North Dakota
, 311 N.W.2d 558, 559 (N.D. 1981).  Rather than shut down its refinery, Amoco utilized temporary workers to keep the refinery operational.  The striking employees filed for unemployment compensation.  
Id.
  The striking employees were awarded unemployment compensation because Job Service determined “a stoppage of work,” as required by the statute, did not occur; Amoco did not shut down or significantly reduce the plant’s operations.  
See
 
id.
  Amoco untimely filed a request for Job Service review, and Job Service denied the request.  The district court affirmed, and Amoco appealed to this Court.  We affirmed the benefit award because the appeal was untimely.  
Id.
 at 564.

[¶21] During the 1981 legislative session, Senator Parker introduced Senate Bill 2354 to amend N.D.C.C. § 52-06-02(4) by precluding unemployment compensation:

For any week with respect to which it is found that his unemployment is due to a 
stoppage of work 
strike, sympathy strike, or work stoppage dispute of any kind 
which exists because of a labor dispute at the factory, establishment, or other premises . . . .

Frustrated with Job Service’s interpretation of “stoppage of work,” Amoco and other businesses testified in support of S.B. 2354.  
See
 
Hearing on S.B. 2354 Before the Senate Industry, Business, and Labor Comm.
, 47th N.D. Legis. Sess. (Feb. 2, 1981) (Testimony of Jim Calley, Amoco Oil Company Employee Relations Manager and Jim DuBois, Northwestern Bell Telephone).

[¶22] On February 2, 1981, Senator Chester Reiten, Chairman of the Senate Industry, Business, and Labor Committee, held S.B. 2354’s first hearing.  Written testimony on S.B. 2354 was submitted by Job Service Deputy Executive Director Mike Deisz:

When the first claim is filed by a worker from that establishment [with a labor dispute], the Job Insurance Director conducts an appropriate investigation to make a determination as to whether or not the labor dispute provisions of the law apply.

. . . .

Once it is determined that the individual’s unemployment is due to a stoppage of work which exists because of a labor dispute at the last place of employment, a further review is conducted to determine: A. Was the worker directly involved in the labor dispute which caused the stoppage of work?, and B. Does the worker belong to a grade or class of workers which were employed at the establishment where the stoppage occurred and who are participating and are directly interested in the dispute?  A further determination is also made then as to whether or not there was a substantial stoppage of work.

. . . .

All individuals who are unemployed because of the work stoppage resulting from the labor dispute would be disqualified unless they could demonstrate that they were not participating in or directly involved in the dispute and were not a member of a class of workers who were employed at the premises before the dispute resulting in the work stoppage, any of whom were participating and are directly interested in the dispute.  An example would be an office worker in a factory.  The office worker is not directly involved in the dispute, nor a member of the class of workers who were involved in the dispute, but is unemployed because the factory shuts down.  That individual could be paid benefits if they were laid off because of a work stoppage.  They would be disqualified, however, if they were actively involved in the strike, even though they were not a member of the class of workers that initiated the strike.

. . . .

Senate Bill 2354 would make the following principal changes to this section of the law in our estimation. Without further direction from the legislature or the courts, we would interpret the impact of Senate Bill 2354 as follows: All portions of the law would remain the same except that where now when there is no longer a stoppage of work, the individual involved in the dispute could draw benefits if otherwise eligible.  Under Senate Bill 2354 no benefits would be paid to those involved in the dispute until the dispute is ended.  This provision would have applied once during the past three years. . . .

Deisz’s testimony makes clear that under Senate Bill 2354, as originally drafted, Job Service understood “stoppage” to be the issue.  “Without further direction from the legislature or the courts, we would interpret the impact of Senate Bill 2354 as follows: All portions of the law would remain the same except that where now when there is no longer a stoppage of work, the individual involved in the dispute could draw benefits if otherwise eligible.”  The further direction came in the subsequent amendment to add “a claimant’s.”  However, both before and after the passage of S.B. 2354, N.D.C.C. § 52-06-02(4)(a) and (b) provided protection for the innocent bystander.  As indicated by Deisz’s testimony, this would not be impacted by S.B. 2354 and cannot have been the impetus suggested by the dissent.

[¶23] Amoco Oil Company, Northwestern Bell Telephone, the Greater North Dakota Association, and three organized labor representatives, also testified at the hearing.  Jim Calley, Amoco Oil Company Employee Relations Manager, testified S.B. 2354 was necessary because Amoco cannot shut down its refinery during a strike and has to use replacement workers to maintain operations.  Calley testified, “[t]he way the law currently reads, unless production is stopped, or significantly reduced, the workers on strike will be eligible for unemployment benefits even though they voluntarily walked off the job.”  
Hearing on S.B. 2354
, 
supra
 (testimony of Jim Calley).

[¶24] Before Calley finished his testimony, he asked the Senate Committee to amend S.B. 2354 to clarify its application.  Specifically, Calley requested “a claimant’s” be inserted in front of “work stoppage.”  Thus, he proposed amending S.B. 2354 by precluding benefits:

For any week with respect to which it is found that his unemployment is due to a 
stoppage of work 
strike, sympathy strike, or a claimant’s work stoppage dispute of any kind
 which exists because of a labor dispute at the factory, establishment, or other premises . . . .

[¶25] North Dakota AFL-CIO President and District 34 Representative Jim Gerl, testified in opposition to S.B. 2354. 
Hearing on S.B. 2354
, 
supra
 (testimony of Rep. Jim Gerl).  During his testimony, Representative Gerl provided the Committee with a letter Amoco sent employees when the 1980 Amoco strike began.  He asserted Amoco was actually locking the employees out, as the letter stated:  “Accordingly, no work will be made available at the outset of the strike to employees in the bargaining unit who might otherwise wish to work.”  
Id.
  After Representative Gerl’s testimony, Senator Tennefos asked, in the context of the Amoco strike, how S.B. 2354 would apply if an employer locked its employees out:

Sen. Tennefos: You don’t know of anybody attempting to get work and being shut out, so to speak?

Rep. Gerl: Senator, I can’t answer; I really don’t know.

. . . .

Sen. Tennefos: Well to management . . . do you know if any of those people in the bargaining unit, did they attempt to get work and were refused?

Mr. Calley: Apparently they did not.

. . . .

Sen. Tennefos: As I read the letter, Mr. Chairman, it says if you desire to return to work you should call such and such for information—so you were certainly afforded the opportunity to make that phone call and come back to that position, wherever you may have been.  I guess the work was available is what I am trying to establish in my mind.  If the work was not available, then I think you have a different picture.

. . . .

[¶26] After Senator Tennefos voiced his concerns, but just before the S.B. 2354’s opponents testified, Chairman Reiten recalled Calley to explain the purpose of adding “a claimant’s” to the bill:

Mr. Calley: I’d like to explain the change [adding “a claimant’s”] since I suggested the change.  The problem with the present law is the stoppage of work disqualifies you from benefits.  The way state Job Service Bureau interprets stoppage of work, they say this means an employer’s stoppage of work—the employer’s plant has to cease working—rather than the employee or the person filing the claim—the claimant’s stoppage of work.   So just to make sure there is no doubt in anyone’s mind what kind of stoppage of work we are talking about in this new amendment, I suggested adding the words “a claimant’s” . . . so we know its him voluntarily stopping work and not the plant stopping work.

Chairman Reiten: So you can’t have a lockout is what you are saying.

Mr. Calley:   Um . . .

Sen. Tennefos: That was the concern of my questions, Mr. Chairman, of Mr. Gerl.  If the plant had a lockout of that individual from allowing him to come to work, then I think he is entitled to benefits.  That is what I wanted to make sure that I was understanding, and I think what you are saying is if the affected employee, he on his own accord stops, not the management stops, then you got something else.

The amendment to add “a claimant’s” passed, and the language was included in the amended bill.

[¶27] The legislative history shows the 1981 Legislature amended N.D.C.C. § 52-06-

02(4) to ensure striking workers were not eligible for unemployment benefits because their employer took alternative measures to maintain operations, thereby not having a “work stoppage.”  In doing so, “a claimant’s,” was added to specify the amendment’s application. Mr. Calley’s clarification as to the purpose of adding “a claimant’s,” at Chairman Reiten’s request, corroborates our initial statutory interpretation.

[¶28] We therefore conclude the legislative history of N.D.C.C. § 52-06-02(4) supports this Court’s interpretation that “a claimant’s work stoppage dispute of any kind” does not include an employer initiated lockout.

V

[¶29] We consider the parties’ other arguments without merit or unnecessary for disposition of this case.  We reverse the district court’s judgment affirming Job Service’s benefit denial and remand to Job Service for proceedings consistent with this opinion.

[¶30] Carol Ronning Kapsner

Mary Muehlen Maring

Crothers, Justice, concurring specially.

[¶31] I concur in the result reached by the majority.  I respectfully submit the discussion by the majority and the dissent have gone farther afield than necessary to decide this case.

[¶32] We are directed by law to interpret words in a statute according to their ordinary sense.  N.D.C.C. § 1-02-02.  “When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.”  N.D.C.C. § 1-02-05.  The statute at issue here provides in pertinent part:

“An individual is disqualified for benefits:

. . . . 

“For any week with respect to which it is found that the individual’s unemployment is due to a strike, sympathy strike, or a claimant’s work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises at which the individual is or was last employed.”

N.D.C.C. § 52-06-02(4).

[¶33] The plain wording of N.D.C.C. § 52-06-02(4) decides this case.  
Ejusdem
 
generis
 analysis may have been appropriate when construing the original 1981 amendment that replaced “stoppage of work” with “strike, sympathy strike, or work stoppage dispute of any kind.”  
See
 Majority Opinion at ¶ 21; 1981 N.D. Sess. Law ch. 503.  However, after the 1981 amendments were changed in committee to add the word “claimant’s,” 
ejusdem
 
generis
 analysis is at best unnecessary and at worst incorrect.

[¶34] The pending case does not present us with a claim for unemployment compensation during a strike or sympathy strike.  If 
ejusdem
 
generis
 analysis is not necessary, no time need be spent pondering how the terms “strike” and “sympathy strike” might lead to a different result under different facts.  If the statute is not ambiguous, and I believe it is not, no time need be spent reviewing legislative committee minutes, hearing tape transcriptions and written testimony.  Nor is our work advanced trying to estimate whose interests were intended to prevail over the other during the 1981 legislative proceedings.  Therefore, instead of a wide ranging discussion about situations and information not relevant to the Court’s inquiry, discussion should be limited to the statute’s language “or a claimant’s work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises at which the individual is or was last employed.”  N.D.C.C. § 52-06-02(4).

[¶35] This relevant portion of the statute has two parts, and both must be satisfied to disqualify a claimant from receiving unemployment benefits.  It is useful to start by looking at the second part requiring a “labor dispute” at the claimant’s work place.  N.D.C.C. § 52-06-02(4).

[¶36] A “labor dispute” is not defined under the North Dakota law regulating unemployment compensation.  However, the term is defined in the chapter regulating court proceedings involving labor disputes and provides:

“‘Labor dispute’ includes any controversy concerning terms or conditions of employment or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment whether or not the disputants stand in the proximate relationship of employer and employee.”

N.D.C.C. § 34-08-01(2).  The term also is defined as:

“A controversy between an employer and its employees concerning the terms or conditions of employment, or concerning the association or representation of those who negotiate or seek to negotiate the terms or conditions of employment.”

Black’s Law Dictionary
 952 (9th ed. 2009).

[¶37] The second element of N.D.C.C. § 52-06-02(4) requiring a labor dispute unquestionably is satisfied in this case by the following stipulated facts:

“The Collective Bargaining Agreement (“CBA”) between Crystal Sugar and the Unions expired on August 1, 2011. 

“On July 28, 2011, Crystal Sugar made its final offer for a Collective [B]argaining Agreement to the Unions.  Crystal Sugar’s final offer was rejected by the voting members. 

“Bargaining unit employees of Crystal Sugar were required to leave the plants at the end of the day, July 31, 2011, as a result of the Company declaring a lockout and has not allowed those employees to return to work.  From August 1, 2011, replacement workers were used and work production has continued unabated.”

From these stipulated facts the Bureau found:

“In this case, it is accepted that a lockout constitutes a labor dispute.  The Court in 
Robberstad v. Dir. North Dakota Employment Security Bureau
, Burleigh County Civil Case No. 28570 (1980), relying upon ‘the general policy of neutrality by the state in labor disputes,’ held that a lockout was a labor dispute.”

[¶38] Having established a “labor dispute,” the second part of the statute is satisfied.  However, what is not satisfied for unemployment compensation disqualification is the existence of “a claimant’s work stoppage dispute of any kind.”  Unlike the second part of the statute, the first part does not look at the overall relationship between the parties.

[¶39] The specific words in the statute’s first part address the “claimant’s work stoppage dispute.”  N.D.C.C. § 52-06-02(4).  The words are not narrowly disqualifying due to a “claimant’s work stoppage.”  Nor are the words broadly disqualifying due to a “claimant’s work dispute of any kind” or a “work stoppage dispute of any kind.”  Rather, the words chosen by the legislature focus on the “
claimant’s
 work stoppage dispute of any kind.”  
Id.
 (emphasis added).

[¶40] The labor dispute here is a company lockout.  North Dakota law does not define a lockout, so we look to use of the term in its ordinary sense.  N.D.C.C. § 1-02-

02.  
Black’s Law Dictionary
 defines lockout as, “An employer’s withholding of work and closing of a business because of a labor dispute.”  
Black’s Law Dictionary
 1024 (9th ed. 2009).  Similar definitions of a lockout used in sister states focus on the employer’s actions.  
See
 
Alexander v. Employment Appeal Bd.
, 420 N.W.2d 812, 814 (Iowa 1988) (“[I]n general, a lockout has been defined as ‘a cessation of the furnishing of work to employees or a withholding of work from them in an effort to get for the employer more desirable terms.’”) (quoting 
Zanesville Rapid Transit, Inc. v. Bailey
, 155 N.E.2d 202, 205 (Ohio 1958)); and 
Mead Products v. Indus. Comm’n of Missouri
, 656 S.W.2d 805, 810 (Mo. Ct. App. 1983) (“The dictionary definition of ‘lockout’ is the withholding of employment by an employer and the whole or partial closing of his business establishment in order to gain concessions from his employees.”) (quoting 48 Am. Jur. 2d 
Labor and Labor Relations
 § 1108 at 895).

[¶41] A company lockout is not “a claimant’s work stoppage dispute of any kind” because the lockout occurs as a result of employer action.  Because a lockout is an employer action, the requirement that the claimant’s unemployment is due to his or her action in a work stoppage dispute is not satisfied.  The absence of one of two factors necessary for disqualifying the claimant from receiving benefits means the claimant is entitled to receive unemployment benefits as provided by law.  Therefore, I would reverse the district court’s decision and remand this matter to Job Service for determination of benefits.

[¶42] Daniel J. Crothers

Sandstrom, Justice, dissenting.

[¶43] I respectfully dissent.

[¶44] There is no dispute that the purpose of S.B. 2354 before the 1981 Legislative Assembly was to deny unemployment benefits when it is the claimant’s work that is stopped—not necessarily all of the employer’s work that is stopped—because of a labor dispute.  There is also no dispute that the law was not to deny unemployment benefits to “innocent bystanders” who are out of work because of a labor dispute of other workers.

[¶45] It is also undisputed that no one told the legislature that it was changing the law in any way regarding lockouts.  But the legislature was explicitly told that 
the
 change in the law was to deny unemployment benefits to workers involved in a labor dispute when the employer’s work is not stopped.

[¶46] The majority relies on an audio recording of the Senate hearing.  The majority interprets the words on that recording to achieve a result inconsistent with the purpose of the legislation under consideration.  The majority does not discuss interpretation of the words consistent with the purpose of the legislation.

[¶47] The statutory language in dispute is “the individual’s unemployment is due to a strike, sympathy strike, or a claimant’s work stoppage dispute of any kind which exists because of a labor dispute at the factory, establishment, or other premises.”  The majority asserts that the plain meaning of this language is limited to cases in which the claimants decide to stop work in a labor dispute and does not include cases in which the employer decides to stop the work in a labor dispute.  It does not discuss the interpretation consistent with the purpose of the legislation.  Yet another interpretation—not thoroughly discussed by the majority—considers the entire sentence and recognizes that the words “a claimant’s work stoppage dispute” is to separate out “innocent bystanders” to a labor dispute whose work may be interrupted because of a strike or lockout in which they are not participants.  For example, a coal strike or lockout that shuts down a steel mill might result in steelworkers being laid off.  A steel strike or lockout might result in no work for railroad workers who transport the steel or for workers in an industry that would have used the steel.  Or a strike or lockout by industrial workers at a facility might shut down the plant, putting office workers not otherwise involved in the dispute out of work.  While Job Service interpreted the previous statutory language to provide innocent bystanders protection, the addition of “a claimant’s” could be interpreted to make that protection explicit.

[¶48] There are a number of problems with the majority’s interpretation.

[¶49] The majority’s interpretation renders the words “a claimant’s work stoppage dispute” meaningless.  It says that “a claimant’s work stoppage dispute” means strike, but strike is already in the clause, and “a claimant’s work stoppage dispute” would be redundant.  The North Dakota Century Code tells us how it is to be interpreted, and every word is intended to have effect.  
See
 N.D.C.C. § 1-02-38(2).  But under the majority’s interpretation, either the word “strike” or the words “a claimant’s work stoppage dispute” are meaningless.

[¶50] The legislature is presumed to know how the courts have interpreted a statute.  
See
 
Lamb v. State Bd. of Law Examiners
, 2010 ND 11, ¶ 10, 777 N.W.2d 343 (“‘Where courts of this State have construed [a] statute and such construction is supported by the long acquiescence on the part of the legislative assembly and by the failure of the assembly to amend the law, it will be presumed that such interpretation of the statute is in accordance with legislative intent.’”) (quoting 
City of Bismarck v. Uhden
, 513 N.W.2d 373, 376 (N.D. 1994)); 
Effertz v. N.D. Workers Comp. Bureau
, 525 N.W.2d 691, 693 (N.D. 1994) (“The legislature is presumed to know the construction of its statutes by the executive departments of the State and the failure to amend the statute indicates legislative acquiescence in that construction.”); 
see also
 
United Hosp. v. D’Annunzio
, 514 N.W.2d 681, 684 (N.D. 1994); 
State ex rel. Kjelden v. Horne
, 98 N.W.2d 150, 154 (N.D. 1959).  Work stoppages or “stoppages of work” in the statute had previously been interpreted to encompass both stoppages because of strikes and stoppages because of lockouts.  
Robberstad v. Dir., N.D. Emp’t Sec. Bureau
, Burleigh County Civil Case No. 28570 (1980).  If the legislature wanted to exclude lockouts, in its final language it would not have left in “work stoppage dispute,” which includes both strikes and lockouts.

[¶51] The phrase “work stoppage dispute” means “strikes and lockouts.”  Under the majority’s interpretation, the added phrase “a claimant’s” means “not lockouts.”  Thus the majority’s interpretation suggests the legislature intended the phrase “a claimant’s work stoppage dispute” to mean “strikes and lockouts, but not lockouts.”  This is not reasonable, and a  reasonable construction is presumed.  N.D.C.C. § 1-02-38(3) (“In enacting a statute, it is presumed that [a] just and reasonable result is intended.”).

[¶52] Since the rules for statutory interpretation direct that every word is to have meaning, the “innocent bystander” interpretation and not the majority’s interpretation is correct.  N.D.C.C. § 1-02-38(2) (“In enacting a statute, it is presumed that [t]he entire statute is intended to be effective.”).

[¶53] If a statute is ambiguous, N.D.C.C. § 1-02-39(1) tells us:

If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

1. The object sought to be attained.

[¶54] The history of the statute reflects that its purpose was to preclude unemployment benefits to those in labor disputes even if the work did not completely stop.  Appellant claimants agree this was the intent of the law. 
 
See
 Appellant’s Brief ¶¶ 43-44.

[¶55] The history of the 1981 legislation reflects that in 1980, union employees at Amoco Oil Company in Mandan went on strike.  
See
 
Amoco Oil Co. v. Job Serv. North Dakota
, 311 N.W.2d 558, 559 (N.D. 1981).  Rather than shut down its refinery, Amoco employed temporary workers to keep the refinery operating.  The striking employees filed for unemployment compensation.  Those claims were denied by a claims examiner in the Job Insurance Division, but an appeals tribunal reversed, and the striking employees were awarded unemployment compensation because “a stoppage of work,” as required by the statute, did not occur; Amoco did not shut down or significantly reduce the plant’s operations.  
See
 
id.
  Amoco untimely filed a request for Job Service review, and Job Service denied the request as untimely.  The district court affirmed, and Amoco appealed to this Court.  This Court affirmed the benefit award because the appeal was untimely.  
Id.
 at 564.

[¶56] During the 1981 legislative session, Senator William Parker introduced Senate Bill 2354 to amend N.D.C.C. § 52-06-02(4) to preclude unemployment compensation in cases such as the Amoco strike when the plant remained in operation.  As the majority notes, frustrated with Job Service’s interpretation of “stoppage of work,” Amoco and other businesses testified in support of S.B. 2354.  
See
 
Hearing on S.B. 2354 Before the Senate Industry, Business and Labor Comm.
, 47th N.D. Legis. Sess. (Feb. 2, 1981) (testimony of Jim Calley, Amoco Oil Company Employee Relations Manager, and Jim DuBois, Northwestern Bell Telephone).  Amoco’s Calley proposed an amendment adding the words “a claimant’s” before the words “work stoppage dispute.”  When adopted, the amendment left the following legislation:

Subsection 4 of section 52-06-02 of the 1979 Supplement to the North Dakota Century Code is hereby amended and reenacted to read as follows:

4. For any week with respect to which it is found that his unemployment is due to a
 stoppage of work 
strike, sympathy strike, or a claimant’s work stoppage dispute of any kind
 which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; provided that this subsection shall not apply if it is shown that:

a. He is not participating in or directly interested in the labor dispute which caused the 
stoppage of work 
strike, sympathy strike, or a claimant’s work stoppage dispute of any kind
; and 

b. He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the 
stoppage 
strike, sympathy strike, or a claimant’s work stoppage dispute of any kind 
occurs, any of whom are participating in or directly interested in the dispute; provided, that if in case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises
, and provided further, that there shall not be deemed to be a stoppage of work in any factory, establishment, or other premises unless there shall be a substantial stoppage of work in each of said factory, establishment, or other premises
.

1981 N.D. Sess. Laws ch. 503.  The majority also does not discuss the language in subsections (a) and (b), which is inconsistent with its interpretation.

[¶57] Labor leader and State Representative Jim Gerl told the committee, “The fact of the matter is, Amoco screwed up.  And now they’re coming to ask you to redo a law for them.”

[¶58] The majority, in supporting its interpretation, relies primarily on its transcription of an exchange near the end of the Senate committee hearing.  The hearing exchange was between State Representative and labor leader Jim Gerl—an opponent of the bill, an Amoco employee, and two senators paraphrasing what they believed others were saying.  None of this exchange is in the committee minutes.  So any legislator who wanted to check the minutes before deciding how to vote on the bill would have found only that the legislation was intended to further 
restrict
 the ability of employees to receive unemployment benefits while in a work stoppage dispute even if some work continued at the plant or place of employment.  If the governor, in deciding whether to sign the legislation, reviewed the minutes, he would have found the same.

[¶59] But the recording is not as helpful to the majority as it claims.  Before Senator Reiten’s statement relied on by the majority, Amoco’s Calley gave an explanation of “a claimant’s” completely consistent with the legislative purpose of precluding benefits for a claimant in a work stoppage even when the plant is not shut down.

Chairman Reiten: Any other questions of Mr. Gerl?  Thank you, Representative Gerl.  Anybody else opposed to 2354?  [Whisper, “counsel would like to explain the words ‘a claimant’s’” . . .]  Ok, you, uh, just you explain the words.  I don’t want you to testify on a case, that part’s over.  Tell us what the word means . . .

Jim Calley: I’d like to explain, I guess, since I suggested the change.  The problem with the present law, it says a stoppage of work disqualifies you from benefits.  And the way that the state job service bureau interprets stoppage of work, they say it means an employer’s stoppage of work—
the employer’s plant has to cease working
—rather than the employee or the person filing the claim, the claimant’s stopping work.  So 
just to make sure there is no doubt
 in anybody’s mind what kind of a stoppage of work we’re talking about in this new amendment, I suggested adding the words “a claimant’s” apostrophe “s” stoppage of work so we know it’s him voluntarily stopping work and 
not the plant stopping work
.

(Emphasis added.)  Senator Reiten and Senator Tennefos misinterpret what Calley has told them, but Calley does not agree with them, and he has been told he is not to testify further.  The mere fact that a senator or two might have misunderstood testimony or the current status of the law does not change the law.

[¶60] The majority does not discuss what happened when the legislation was heard before the House Industry, Business and Labor Committee.  In his transcribed testimony before the committee, Job Service Deputy Executive Director Mike Deisz explained the bill, which included the words “a claimant’s work stoppage dispute” in it, and told the committee the bill precluded benefits for workers in a work stoppage dispute:

Once, 
this is where the change in the law comes into effect
, the present time, under present law, if there’s a dispute, and that dispute results in a stoppage of work, once there is a substantial resumption of activity, or the stoppage/substantial stoppage at work no longer exists, individuals who are unemployed because of the dispute could begin to draw benefits, even if the dispute had not formally ended.  We had a case several years ago where the Gary [Amoco] was involved.  During the course of the dispute, jobs were eliminated, those people then were determined eligible at that point in time.  A situation where normal activities are resumed because of hiring of other workers, and, again, once the activities resume, those people were unemployed because of a stoppage and the dispute could become eligible for benefits.  
Under Senate Bill 2354, no benefits would be paid to those individuals who are involved in the dispute until the dispute is ended.

(Emphasis added.)  Deisz also told the House Industry, Business and Labor Committee:

If there is a substantial stoppage of work because of the dispute, individuals who became unemployed because of a work stoppage would be disqualified or paid benefits on the following basis:  first of all, all individuals who are unemployed because of the stoppage resulting from the dispute would be disqualified, unless they demonstrate that they were not participating in or directly involved in the dispute or were not a member of the class of workers who are employed at the premises before the dispute started.  
An example would be that, say there’s a factory, and then a, the assembly line workers go out on strike; because the work stops and the factory shuts down, a secretary could become unemployed because of the strike.  In that case, if that individual is not a member of the class of workers involved in the dispute and is not actively involved in the dispute, that person would be eligible for benefits if they met the other requirements of the law.

(Emphasis added.)

[¶61] Nothing was said about excluding lockouts.

[¶62] State Representative and labor leader Jim Gerl testified against the bill before the House committee as well.  If, in fact, the bill was intended by the legislature to be a huge boon to organized labor by allowing unemployment benefits to workers involved in labor disputes in case of lockouts, why would Representative Gerl have opposed the bill?  Why did he vote against it?  Indeed, Gerl’s House testimony does not assert, nor does anyone’s House testimony assert, that adding the words “a claimant’s” excludes lockouts.  Instead, if anything, Gerl’s testimony is contrary to that assertion:

The words “a claimant’s” when added to this bill, as the Senate did, were just to increase the chance for confusion and the expensive possibility of the need to seek clarification of the courts.

[¶63] All the other labor representatives testifying before the House committee condemned the legislation.

[¶64] For example, Lloyd Putney, representing Ironworkers Union #793, told the committee:

I’m against the bill.  Labor’s fought hard for many of these labor laws.  Labor laws on the book to handle these situations, and I guess probably we could solve the whole thing with unemployment, workman’s comp, and various other bill[s].  We could just pool all of the money together, we could give all the money to the state penitentiary, we could just lock up all the workers until they’re needed finally.  We could use the money for gruel and cornbread.  We could feed the workers until they’re finally needed and then put ’em to work.  We could chain ’em up so we know damn well they couldn’t walk off the job.  
These kind of regressive laws are sickening.

(Emphasis added.)

[¶65] The majority argues the primary purpose in interpreting legislation is to give effect to the legislative intent.  Does anyone really believe the legislature’s intent with this bill was to give a huge benefit to organized labor?

[¶66] Long-standing interpretations by an agency are to be given deference in interpreting an ambiguous statute.  Job Service gave its interpretation of the final form of the legislation to the House Industry, Business and Labor Committee before the legislation was adopted.  That interpretation supports that the legislation applied to both strikes and lockouts.

[¶67] The majority incorrectly claims the principal of 
ejusdem generis
 strengthens its interpretation.  While not included in the North Dakota Century Code instructions on how it is to be interpreted, the principal can be helpful in some cases in discerning the intent of legislation.  “The 
ejusdem generis
 canon applies when 
a drafter has tacked on a catchall phrase
 at the end of an enumeration of specifics, as in 
dogs, cats, horses, cattle, and other animals
.”  Antonin Scalia and Bryan A. Garner, 
Reading Law:  The Interpretation of Legal Texts
 199 (2012) (emphasis added).  But here a catchall phrase was not tacked on.  Rather, additional specifics were added to pre-

existing language.  And N.D.C.C. § 1-02-39(4) tells us specifically that in interpreting an ambiguous statute, the “former statutory provisions” are to be considered.

[¶68] Finally, as the Attorney General argues, the Job Service interpretation is consistent with a policy of remaining neutral in labor disputes.  
See
 
Robberstad v. Dir., N.D. Emp’t Sec. Bureau
 
(North Dakota subscribes to the “general policy of neutrality by the state in labor disputes.”).

[¶69] I would affirm.

[¶70] Dale V. Sandstrom

VandeWalle, Chief Justice, dissenting.

[¶71] 
I respectfully dissent.  Section 52-06-04(2), N.D.C.C., is, I believe, ambiguous.  The legislative history of the amendments to the statute is no less ambiguous as illustrated by the majority opinion and Justice Sandstrom’s dissenting opinion.  It is particularly in this circumstance that I defer to the interpretation of the statute by the agency charged with its execution, in this instance, Job Service North Dakota.  
See, e.g.
, 
Frank v. Traynor
, 1999 ND 183, 600 N.W.2d 516 (holding that construction of a statute by an administrative agency charged with its execution is entitled to weight and the Supreme Court will defer to a reasonable interpretation of that agency unless it contradicts clear and unambiguous statutory language).  This is a matter for the Legislature to resolve.  I would affirm the judgment of the district court affirming the decision of Job Service North Dakota denying the Claimants unemployment benefits.

[¶72] Gerald W. VandeWalle, C.J.