2013 ND 97

**Brenda ALBRIGHT, Claimant and Appellee**

v.

**NORTH DAKOTA WORKFORCE SAFETY & INSURANCE, Appellant**

and

**Smurfit–Stone Container Corporation, Respondent.**

No. 20120298.

Supreme Court of North Dakota.

June 19, 2013.

Douglas W. Gigler, Special Assistant Attorney General, Fargo, ND, for appellant.

Mark G. Schneider, Fargo, ND, and Mac J. Schneider, Grand Forks, ND, for appellee.

KAPSNER, Justice.

[¶ 1] Workforce Safety and Insurance ("WSI") appeals from a district court judgment reversing the Administrative Law Judge's ("ALJ") final order affirming WSI's denial of Brenda Albright's application for workers compensation benefits for a back injury and a judgment awarding attorney fees and costs. We reverse the judgments and reinstate WSI's order denying benefits, concluding the decision of the ALJ affirming the decision of WSI is supported by a preponderance of the evidence, WSI adequately established that Albright's treating physicians' opinions were inconsistent with other substantial record evidence under N.D.C.C. § 65–05–08.3, and the district court erred in awarding Albright attorney fees and costs under N.D.C.C. § 28–32–50(1).

I

[¶ 2] In June 2010, Albright submitted a benefits claim to WSI reporting a work-related back injury incurred after squatting down to pull a label off a roll of paper. Albright testified that as she stood up, she felt extreme pain in her back. Albright was taken to the emergency room, and an MRI confirmed a disk herniation at L1–L2.

[¶ 3] In 1991, Albright began working at Smurfit–Stone Container Corporation ("Smurfit"), a cardboard box manufacturer. Albright worked in various positions at Smurfit, and in 1994, she began working as a forklift operator. Her job as a forklift operator was physically demanding, she testified, because loading, transporting, and unloading items caused significant jar-

ring and bouncing, and the forklift had little or no suspension. Albright also testified that once a load was secured on the front of the forklift, it was dangerous to drive forward because the load blocked her view; as a result, she delivered loads in reverse, causing her to rotate her trunk approximately 180 degrees as she maneuvered the forklift. Albright asserts the trunk rotation and jarring and bouncing took a toll on her back.

[¶ 4] Albright has a history of back problems going back to at least 2001, and she has had neck problems as well. In 2004, Albright treated with a physician's assistant, Heidi Olson–Fitzgerald, for acute onset of low back pain after she bent over to pick up some towels. Olson–Fitzgerald assessed Albright with: "1. Low back pain with left L5–S1 radicular symptoms; 2. Degenerative disk disease L5–S1; and 3. Degenerative cervical disk disease C3 through C7." Olson–Fitzgerald noted that Albright's x-rays showed fairly severe degenerative changes in the cervical spine. An MRI was performed in November 2004, which was summarized as showing "[m]ultilevel degenerative disease with broad-based disk changes at several levels, most prominent at L3–4." In 2005, Olson–Fitzgerald noted that Albright had "degenerative cervical disk disease [and] lumbar degenerative disk disease...."

[¶ 5] Albright continued to have back problems, and a 2007 MRI revealed:

1) Degenerative cervical disk changes are most severe at C5–6 and C6–7, and to a lesser degree at C4–5. 2) At C5–6, a broad-based and right-sided disk herniation (disk protrusion) deforms the thecal sac, causes right-sided foraminal stenosis and possible impingement of the right C6 nerve root. Please correlate as to a possible right C6 radiculopathy. 3) At C6–7, broad-based posterior calcified disk protrusion and osteophyte causes

thecal sac deformity more to the right of midline without cord compression or significant foraminal narrowing; 4) Mild posterior disk bulge at C4–5.

In 2007, Albright began treating with Dr. Marc Eichler, a neurosurgeon. In 2008, Dr. Eichler operated on Albright's neck, performing a corpectomy for spinal cord compression with bilateral C5–C6 and C6–C7 foraminotomies for decompression of the C6–C7 roots.

[¶ 6] On June 8, 2010, Albright reported that after squatting down to remove the label from a roll of paper, she felt pain in her right side and right back. She was treated at an emergency room. An MRI summary noted Albright had "multilevel degenerative disk disease" and herniation at L1–L2. On July 23, 2010, Dr. Eichler performed his second surgery on Albright's spine. This surgery consisted of "an L1–2 facetectomy on the right for removal of the intraforaminal disk herniation and decompression of right L1 nerve root, and ... an L1–2 fusion and stabilization secondary to the complete facetectomy on the right." Prior to this surgery, Dr. Eichler noted Albright had mild lumbar spondylosis with a high intensity at L3–L4, and other disk bulges at L2–3, L3–4, and L4–5.

[¶ 7] Around the time of Albright's surgery, WSI had Dr. Gregory Peterson, a WSI medical consultant, review Albright's current and prior medical records to see if her claimed injury was work related. Dr. Peterson noted Albright has an "extensive prior history of cervical and lumbar spine problems" as the "MRI shows multi-level lumbar [degenerative disk disease]" and a large right L1 disk protrusion. Dr. Peterson opined Albright had preexisting symptomatic multi-level degenerative disk disease, and "[h]er condition was made symptomatic by her performing the trivial act of bending." Dr.

Peterson noted his opinion has a "significant exploitable weakness," because if he defined her condition as L1 disk herniation rather than degenerative disk disease, he would not be able to demonstrate that specific condition as preexisting.

[¶ 8] In August 2010, Dr. Charles Burton, a neurosurgeon, conducted an independent medical records review of Albright's case. Dr. Burton opined that Albright's "well-documented multilevel degenerative disk pathology and multilevel segmental dysfunction" contributed to her June 8, 2010, incident. He further opined that the incident did not substantially accelerate Albright's preexisting condition because the herniation could have happened at any time or place. Dr. Burton stated Albright's underlying condition served to increase the likelihood of "mechanical" injuries, which are incurred from routine activities such as leaning forward, twisting, and standing up. According to Dr. Burton, Albright's "past history contains many examples of . . . mechanical back pain episodes having occurred with bending and lifting." Ultimately, Dr. Burton concluded Albright's bending action on June 8, 2010, was "the straw that broke the camel's back." WSI wrote to Dr. Eichler to see if he agreed with Dr. Burton's opinion. In October 2010, Dr. Eichler responded, indicating he was not in complete agreement with Dr. Burton's opinion.

[¶ 9] After initially determining it had liability, WSI denied the claim, determining Albright had a preexisting condition, and the June 2010 incident had only triggered symptoms related to her condition. Albright requested reconsideration, and WSI denied her request. WSI's claim denial stated: "Claimant's pre-existing lumbar spine condition includes multilevel degenerative changes throughout her lumbar spine, and retrolisthesis at multiple levels including L1–L2, and narrowing of the L5–S1 interspace, and mild interplate changes at L3–L4, and low back pain with left L5–S1 radicular symptoms." Albright requested a formal hearing before an ALJ. At the hearing, Albright testified that while she previously had back problems, she has not had problems in the L1–L2 area. In support of her benefit claim, Albright presented documentary evidence consisting of letters from Olson–Fitzgerald, Dr. Eichler, and a chiropractor, Dr. Kevin Paape.

[¶ 10] Olson–Fitzgerald's letter opined Albright's preexisting degenerative disk disease was due to the demanding activities of her job, and Albright's condition placed her at risk for the June 8, 2010, injury. Dr. Paape's letter stated Albright's job duties are "most likely" the cause of her degenerative disk disease. Dr. Eichler wrote two letters on Albright's behalf. First, in response to Dr. Burton, Dr. Eichler opined that the June 8, 2010, work event caused the herniation. Dr. Eichler's second letter stated Albright's job operating a forklift "is known to lead to degenerative disk disease," and her herniation at L1–L2 is probably related to her overall degenerative disk disease. He concluded by stating that he felt Albright's herniated disk at L1–L2 was directly related to a work injury. Olson–Fitzgerald, Dr. Eichler, and Dr. Paape did not testify at the hearing and were not deposed. Dr. Burton was deposed, and his deposition transcript was used at the hearing. In his deposition, Dr. Burton opined that Albright's underlying condition was not a result of her working conditions.

[¶ 11] The ALJ denied Albright's claim and issued Findings of Fact, Conclusions of Law, and an Order, concluding: "The cause of Albright's injury was not the result of a single incident occurring on June 8, 2010. Her work duties or work condi-

tions did not substantially accelerate or substantially worsen her pre-existing condition." The ALJ also concluded Albright's underlying condition was not caused by her working conditions. In November 2011, Albright petitioned the ALJ for reconsideration which was subsequently denied.

[¶ 12] Albright appealed to the district court. The district court reversed the ALJ's decision, concluding, "Albright clearly proved the unique loads and stresses incident to her work were at least a substantial contributing factor to the development of this pathology." The court further concluded, "the record clearly establishes that the L1–2 disk herniation/compression was an acute event that occurred at work on June 8, 2010, which substantially accelerated the progression, or worsened the severity, of any pre-existing disease that may [have] been present." WSI appealed the benefit award to this Court. Albright filed a motion seeking attorney fees and costs, and the district court granted her motion, concluding WSI did not act with substantial justification in denying Albright's benefit claim. WSI appealed the attorney fees and costs award, and Albright also seeks attorney fees and costs for this appeal.

## II

[¶ 13] This Court reviews administrative agency decisions in the same manner as the district court. *Mickelson v. N.D. Workforce Safety & Ins.*, 2012 ND 164, ¶ 7, 820 N.W.2d 333; N.D.C.C. § 28–32–49. Under N.D.C.C. §§ 28–32–46 and 28–32–49, this Court affirms an agency's decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

*Mickelson*, at ¶ 7. However, interpretation of a statute is a question of law, and this Court reviews questions of law de novo. *Id.* at ¶ 8.

[¶ 14] In reviewing an ALJ's factual findings, this Court has said: "[A] court may not make independent findings of fact or substitute its judgment for the ALJ's findings; rather, a court must determine only whether a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence from the entire record." *Mickelson*, 2012 ND 164, ¶ 8, 820 N.W.2d 333 (citation omitted). This Court reviews the agency decision, but "the district court's analysis is entitled to respect." *Snyder v. N.D. Workers Comp. Bureau*, 2001 ND 38, ¶ 7, 622 N.W.2d 712.

## III

[¶ 15] Our disposition of this case turns, in part, on the interpretation of

N.D.C.C. § 65–05–08.3, the "[t]reating doctor's opinion" statute.

[¶ 16] Under N.D.C.C. § 65–05–08.3, if WSI:

> [D]oes not give an injured employee's treating doctor's opinion controlling weight, the organization shall establish that the treating doctor's opinion [1] is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or [2] is inconsistent with the other substantial evidence in the injured employee's record based on one or more of the following factors:
>
> a. The length of the treatment relationship and the frequency of examinations;
>
> b. The nature and extent of the treatment relationship;
>
> c. The amount of relevant evidence in support of the opinion;
>
> d. How consistent the opinion is with the record as a whole;
>
> e. Appearance of bias;
>
> f. Whether the doctor specializes in the medical issues related to the opinion; and
>
> g. Other relevant factors.

[¶ 17] Section 65–05–08.3, N.D.C.C., was passed in 2009 and has not been analyzed by this Court. Albright argues N.D.C.C. § 65–05–08.3 creates a presumption that her treating physicians' opinions are to receive controlling weight unless WSI rebuts the presumption, based on the statutory factors.[1] In contrast, WSI argues N.D.C.C. § 65–05–08.3 merely codifies this Court's caselaw stating that if WSI is going to disregard a treating physician's opinion, it must consider the entire record, clarify inconsistencies, and ade-

quately explain the reason for disregarding medical evidence favorable to the claimant. *See, e.g., Bruder v. N.D. Workforce Safety & Ins. Fund,* 2009 ND 23, ¶ 9, 761 N.W.2d 588.

▇▇▇ [¶ 18] "The primary purpose of statutory interpretation is to determine legislative intent." *Olson v. Job Serv. N.D.,* 2013 ND 24, ¶ 5, 827 N.W.2d 36 (quoting *Teigen v. State,* 2008 ND 88, ¶ 19, 749 N.W.2d 505). "In doing so, '[t]he Legislature's intent must be sought initially from the statutory language.'" *Id.* (quoting *District One Republican Comm. v. District One Democrat Comm.,* 466 N.W.2d 820, 824 (N.D.1991)). If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute. *Olson,* at ¶ 5 (citation and quotation omitted). " 'Words ... in a[ ] statute are to be understood in their ordinary sense, unless a contrary intention plainly appears....' " *Id.* (quoting N.D.C.C. § 1–02–02). But, if the statute is ambiguous or of doubtful meaning, the court may look to extrinsic aids to interpret the statute. *Olson,* at ¶ 5 (citing *Teigen,* at ¶ 19; *District One Republican Comm.,* 466 N.W.2d at 825). "A statute is ambiguous when it is subject to different, but rational meanings." *HIT, Inc. v. North Dakota Dep't of Human Servs.,* 2013 ND 51, ¶ 7, 828 N.W.2d 792 (quotation omitted).

[¶ 19] This statute is ambiguous. Section 65–05–08.3, N.D.C.C., as applied in this case, states that "[i]f the organization" does not give a treating doctor's opinion "controlling weight," WSI "shall establish"

---

1. Albright argues that Dr. Eichler, Dr. Paape, and Olson–Fitzgerald are all considered treating physicians under the statute, and WSI argues Dr. Eichler is the only treating physi- cian. We need not resolve the issue of whether a claimant can have more than one treating physician because the ALJ analyzed all of Albright's medical opinions in his decision.

it is inconsistent with other substantial record evidence, based on one or more enumerated factors. The statute's introductory language, "[i]f the organization," can rationally be interpreted to state, as WSI argues, that WSI need only make clear its reasons for denying benefit claims when there is a medical opinion from the treating doctor favorable to the injured worker. Conversely, the phrase "shall establish," in conjunction with the preceding "controlling weight" language, can also rationally be interpreted to state, as Albright argues, that the statute creates a presumption that a treating doctors's opinion receives controlling weight, unless WSI "establish[es]" it is inconsistent with other substantial record evidence based on the statutory factors.

[¶ 20] Because we conclude the statute is subject to different, rational meanings, we look to the statute's legislative history for guidance. In 2009, House Bill 1561 was introduced by Representative Jasper Schneider and three other legislators. *Hearing on H.B. 1561 Before the House Industry, Business, and Labor Comm.,* 61st N.D. Legis. Sess. (Jan. 28, 2009).

[¶ 21] Entitled the "Treating doctor's opinion," H.B. 1561, as originally introduced, stated:

1. In considering the injured employee's medical status, the organization shall give controlling weight to the injured employee's treating doctor's opinion if the treating doctor's opinion on the issues of the nature and severity of the injured employee's medical condition is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the injured employee's record.

2. If the organization does not give an injured employee's treating doctor's

opinion controlling weight, the organization shall determine the weight to give the doctor's opinion by applying the following factors:

   a. The length of the treatment relationship and the frequency of examinations;

   b. The nature and extent of the treatment relationship;

   c. The amount of relevant evidence in support of the opinion;

   d. How consistent the opinion is with the record as a whole;

   e. Whether the doctor specializes in the medical issues related to the opinion; and

   f. Other relevant factors.

3. This section applies to decisions made by the organization, reconsiderations, rehearings, and appeals.

[¶ 22] At the January 28, 2009, House Industry Business and Labor (IBL) Committee hearing, Representative Schneider introduced H.B. 1561. He stated the intent of section 1 is to give a treating doctor's opinion controlling weight and to put the burden on WSI to show otherwise, based on section 2's factors. *Hearing on H.B. 1561, supra* (testimony of Rep. Schneider). WSI attorney Rob Forward testified in opposition, noting this bill would give the treating physician's opinion an "automatic presumption of superiority" by giving it controlling weight, but noted this Court has previously refused to give a treating physician's opinion a presumption of controlling weight. *See Hearing on H.B. 1561, supra* (written testimony of Rob Forward) (citing *Swenson v. N.D. Workforce Safety & Ins. Fund,* 2007 ND 149, ¶¶ 26–27, 738 N.W.2d 892).

[¶ 23] After this hearing, H.B. 1561 was amended to state:

1. ~~In considering the injured employee's medical status, the organization~~

shall give controlling weight to the injured employee's treating doctor's opinion if the treating doctor's opinion on the issues of the nature and severity of the injured employee's medical condition is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the injured employee's record.

2. 1. If the organization does not give an injured employee's treating doctor's opinion controlling weight, the organization shall determine the weight to give the doctor's establish that the treating doctor's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the injured employee's record based on one or more of opinion by applying the following factors:

   a. The length of the treatment relationship and the frequency of examinations;

   b. The nature and extent of the treatment relationship;

   c. The amount of relevant evidence in support of the opinion;

   d. How consistent the opinion is with the record as a whole;

   e. Appearance of bias;

   e. f. Whether the doctor specializes in the medical issues related to the opinion; and

   f. g. Other relevant factors.

3. This section applies to decisions made by the organization, reconsiderations, rehearings, and appeals.

2. This section does not apply to managed care programs under section 65–02–20. For purposes of this section, the organization shall determine whether a doctor is an injured employee's treating doctor.

[¶ 24] At the February 3, 2009, House IBL Committee Hearing, Chairman George Keiser discussed the intent of the amended bill, and he stated: "It is basically putting the statute with [what] the current practice is, and [WSI does not] see it having a significant financial impact." *Hearing on H.B. 1561 Before the House Industry, Business, and Labor Comm.*, 61st N.D. Legis. Sess. (Feb. 3, 2009). Representative Schneider was present, and he moved to pass the amended bill. Chairman Keiser asked for discussion, and Representative Dan Ruby asked what the bill actually does, if it just codifies the current practice. Chairman Keiser stated:

> The organization currently gives an injured employee's treating doctor's opinion controlling weight, but the organization can object using one or more of the following conditions.... [T]he reality is, if the treating doctor says "X," currently they have to pretty much accept it or say through their quality review program say, "we disagree ... that doesn't sound right." So they still have the opportunity to say that they disagree ... and they currently do. If they disagree with the treating doctor's opinion, they have to send the claimant a notification as to what the problem is right now.

*Hearing on H.B. 1561, supra.* After Chairman Keiser's remarks, Representative Schneider commented:

> [O]ne of my intents for this bill, even though the language is different than the original, I think the intent still preserves. My goal is to try to make, when claimants get their determination from WSI ... and they get denied, for example, a comprehensive denial as possible so the claimant is not frustrated, and the treating doctor is not frustrated. They

know specifically why their claim was denied. To some extent WSI is doing that now, I think they by and large are, I think codifying it will only further prove the fact; especially now ... that the Governor appoints the Board and Executive Director, [though] that could change down road....

Chairman Keiser fielded another question about what Representative Schneider's amendment does and replied:

There is a big distinction here, members of the committee. [Subsection] one gave the power to the treating physician; subsection one that has now been removed. Now subsection two is saying, "Ok," we are not saying that they have control, but if they make a recommendation and [WSI] disagrees, [WSI] ha[s] to provide a reason for why [WSI] disagrees. That ... could reduce litigation.

The House IBL Committee then passed H.B. 1561, as amended. *Hearing on H.B. 1561, supra.*

[¶ 25] At the March 10, 2009, Senate IBL Committee Hearing, Senator Tracy Potter asked Representative Schneider what remains of the original bill after the House Committee amendments, and Representative Schneider replied:

The way the bill was structured in its original form, was really two parts. The first part defined the rule ... the general rule the treating physician will be given controlling weight, and then the second section ... [was] basically [to] show discretion or how that could be rebutted. And what it did it also said ... WSI had to go through and demonstrate in "a-f" why they weren't following them, and WSI felt that was overly burdensome and so we amended it to include one or more of the following factors ... and [added] appearance of bias ... and the whole subsection

two.... To answer your second question, I believe WSI will testify to this, what they did on the House side, this really just codifies what their current practices are.

*Hearing on H.B. 1561 Before the Senate Industry, Business, and Labor Comm.,* 61st N.D. Legis. Sess. (Mar. 10, 2009) (testimony of Rep. Schneider).

[¶ 26] WSI's General Counsel, Jodi Bjornson, next testified in support of the amended bill. Her written testimony noted WSI opposed the bill in its original form, but now supported it because the standard that H.B. 1561 created is really a codification of current caselaw. Bjornson's written testimony cited caselaw requiring WSI to "consider the entire record, sufficiently address the evidence, and adequately explain its reasons for disregarding [favorable medical] evidence presented to it by the claimant" as the current standard. *Hearing on H.B. 1561, supra* (written testimony of Jodi Bjornson) (quoting *Swenson,* 2007 ND 149, ¶ 26, 738 N.W.2d 892).

[¶ 27] Based on H.B. 1561's legislative history, we conclude that the legislature's intent in passing H.B. 1561 was to codify caselaw stating that if WSI disregards medical evidence favorable to a claimant WSI must consider the entire record, clarify inconsistencies, and adequately explain the reason for disregarding medical evidence favorable to the claimant, applying the two tests and the factors identified in N.D.C.C. § 65–05–08.3.

## IV

[¶ 28] To be eligible for WSI benefits, Albright must show her eligibility by a preponderance of the evidence. *Unser v. N.D. Workers Comp. Bureau,* 1999 ND 129, ¶ 22, 598 N.W.2d 89. In doing so, she must show the condition for which

benefits are sought is causally related to a work injury. *Manske v. Workforce Safety & Ins.*, 2008 ND 79, ¶ 9, 748 N.W.2d 394. "To establish a [causal] connection, a claimant must demonstrate the claimant's employment was a substantial contributing factor to the injury and need not show employment was the sole cause of the injury." *Mickelson*, 2012 ND 164, ¶ 11, 820 N.W.2d 333 (citation omitted). Section 65–01–02(10), N.D.C.C., defines "[c]ompensable injury" as "an injury by accident arising out of and in the course of hazardous employment which must be established by medical evidence supported by objective medical findings." Excluded from this term are "[i]njuries attributable to a preexisting injury, disease, or other condition, including when the employment acts as a trigger to produce symptoms in the preexisting injury, disease, or other condition unless the employment substantially accelerates its progression or substantially worsens its severity." N.D.C.C. § 65–01–02(10)(b)(7). If WSI chooses to disregard medical evidence favorable to a claimant, WSI must adequately explain, in the context of N.D.C.C. § 65–05–08.3's tests and enumerated factors, its rationale for disregarding the evidence.

[¶ 29] The ALJ's Findings of Fact, Conclusions of Law, and Order made a number of specific factual findings addressing the competing expert physicians' opinions and ultimately accepted the opinion of Dr. Burton, a board certified neurologist, over the opinions of Dr. Eichler, Dr. Paape, and Olson–Fitzgerald.

▬ [¶ 30] Albright argues she has established that she suffered a compensable injury during the course of employment. Specifically, she asserts the "nature of her work was a substantial contributing factor to her preexisting degenerative disk disease," and alternatively, "[n]o reasoning mind could reasonably conclude that [her] preexisting degenerative disk disease failed to be substantially accelerated or substantially worsened by the L1–L2 disk herniation that occurred on June 8, 2010."

[¶ 31] On October 8, 2010, Dr. Eichler issued a one-page letter in response to Dr. Burton's independent medical review of September 17, 2010. According to the ALJ, Dr. Eichler's opinion "took the strong position that he was not in complete agreement with [Dr. Burton]," who opined that:

> The work incident of June 8, 2010 did not substantially accelerate the progression of Ms. Albright's pre-existing multi-level chronic condition. In my opinion, the event, which could have occurred at any time or any place, just happened to be at work and was related to body mechanics and body dynamics that place particular stress on the L1–L2 segment.

Dr. Eichler's first opinion letter stated, in relevant part:

> I did review the [independent medical review] by Dr. [Burton] and I am not in complete agreement with the [independent medical review]. I do agree with Dr. [Burton] that [Albright's] underlying spondylotic changes in her lumbar spine did put her at increased risk for herniated disk, however her injury clearly did occur at work when she stood up after squatting. A majority of patients that I see in my office with significant cervical or lumbar problems almost all have previous underlying spondylotic problems. This case would be similar to a female with a history of osteoporosis who falls at work and suffers a compression fracture. To state that her compression fracture is secondary to her osteoporosis and not from a fall at work does not make any sense. Clearly Mrs. Albright did not have any right lower extremity radiating pain consistent with an L2 radiculopathy until her work injury.

Therefore I am in agreement with Dr. [Burton] that she did have an underlying history of spondylosis, which could have increased her risk for a herniated disk in her lumbar spine, but clearly the single event at work led to her herniated disk. Just because she has underlying spondylosis, as [do] millions of Americans, it does not mean that she was doomed to have a herniated disk in the future.

On April 11, 2011, Dr. Eichler issued a second one-page letter, which the ALJ characterized as "severely weaken[ing]" his October 8, 2010, opinion. Here, Dr. Eichler stated, in relevant part:

I am writing this letter in support of [Albright's] appeal for workers compensation. . . . The patient was found to have overall lumbar spondylosis with degenerative disk and facet disease and clearly this could be related to her work. She does operate a forklift, and the continued jarring as well as twisting and bending is known to lead to degenerative disk disease. She also had a clear acute disk herniation on the right side at L1–2 probably related to her overall degenerative disk disease which again is most likely related to her repetitive activities at work. In addition I explained to the patient that her previous workup of her lumbar spine and back pain by Dr. Olson–Fitzgerald and by Dr. Hutchison among others clearly showed significant lumbar spondylosis in the low back but not higher up in the lumbar spine. It is therefore possible this acute disk herniation on the right side at L1–2 was entirely related to twisting and bending in a single episode while at work. I am unclear as to why workers compensation does not feel that her overall injury is related to her work activities. It does seem fairly clear to me by reviewing her history that this was an acute event that occurred while she was working. If you have any other questions as to why I feel Ms. Albright's herniated disk at L1–2 is directly related to a work injury or why I believe that her worsening lumbar spondylosis is also related to repetitive activities at work, please feel free to contact me.

The ALJ's order denying Albright's reconsideration petition noted that a review of "Dr. Eichler's opinion shows that his opinion goes from a definitive single occurrence incident to a possible single occurrence incident." The ALJ noted this second letter contained "multiple mentions of mere possibilities including this injury not being a single occurrence incident injury." Though Albright argues that the ALJ took Dr. Eichler's opinions out of context, the ALJ underscored the problem he faced: Dr. Eichler's opinion letters appeared to conflict, and "Albright had the opportunity to call Dr. Eichler as a witness to clarify any statements and failed to do so." As a result, the ALJ found "Eichler did not have a strong opinion and by not testifying and being subject to any cross-examination, any opinion by Eichler on this case was weak at best."

[¶ 32] Olson–Fitzgerald's opinion was documented in a one-page letter. The ALJ noted that "Olson–Fitzgerald's opinion about causation was different from Eichler's original opinion of October 8, 2010 as she opined that Albright's back condition was the result of years of work rather than being a single episode." In essence, Olson–Fitzgerald opined that Albright's injury was incurred from years of demanding physical work and twisting. The ALJ also noted "[t]he wording of her letter . . . does not show much assurance in her opinion" as she couched her opinion in language suggesting uncertainty. Similar to Dr. Eichler, the ALJ noted, "Olson–Fitzgerald did not testify and did not subject herself to cross-examination; therefore, it was unknown how strong her opinion was

especially when it was already weakly worded."

[¶ 33] Dr. Paape's opinion was also documented in a one-page letter, and the ALJ noted: "(1) there are no medical records in evidence that show when, how often, or what examinations or treatments Albright had with Paape; (2) his opinion was different from Eichler's at the time it was issued; (3) he did not testify and subject himself to cross-examination; (4) there was nothing known more about Paape except that he was a chiropractor because there was no testimony of his education, training, or experience that would show why his opinion should be given more weight; and (5) also without testifying, we do not know what work duties he opined caused or contributed to Albright's DDD and it was unknown exactly what information he understood was Albright's job duties." Like Olson–Fitzgerald, Dr. Paape's opinion was that Albright's injury was incurred from years of demanding physical work and twisting.

[¶ 34] The ALJ summarized eight reasons why he found Albright's treating doctors' opinions were not "consistent with the other substantial evidence in Albright's medical records . . . ."

1. Neither Eichler nor Paape had been treating Albright since the beginning of when she started having low, lumbar back problems;

2. There was no indication that either Eichler or Paape have reviewed the previous medical records of Albright;

3. None of the medical providers testified and subjected themselves to cross-examination;

4. None of the medical providers gave any details as to what facts they used to support their conclusions;

5. Eichler's and Olson–Fitzgerald's opinions are not strongly worded;

6. None of the medical providers drew any connection between Albright's past cervical back issues and her current back issues;

7. None of their education, training, and experience was identified to indicate that additional weight should be given [to] their testimony; and

8. Their opinions are not supported by the record as a whole.

Although not directly quoting from N.D.C.C. § 65–05–08.3's enumerated list, these items relate to "the amount of relevant evidence in support of the opinion" and "how consistent the opinion is with the record as a whole." Moreover, N.D.C.C. § 65–05–08.3 allows WSI to establish that the treating doctor's opinion is inconsistent with substantial record evidence based on one or more of the factors, and the statute allows WSI to consider "[o]ther relevant factors."

[¶ 35] Unlike Albright's medical providers, Dr. Burton did not examine Albright. Rather, he performed a records review of Albright's case, which the ALJ noted was a weakness in Dr. Burton's opinion that weighed against his medical opinion. Dr. Burton opined that, although the work incident triggered symptoms in Albright's underlying degenerative condition, it did not substantially accelerate its progress because the disk herniation could have happened at any time or place. He further explained that "this vertebral segment was not normal to start with and that this bending action seems to simply represent the 'straw that broke the camel's back.'" After completing his records review, Dr. Burton was deposed and was cross-examined.

[¶ 36] During his deposition, Dr. Burton testified Albright had "multiple disk herniations and multiple-level degenerative pathology and multilevel segmental dysfunction" that included a chronic disk her-

niation of L1–L2. Dr. Burton reiterated his previous opinion that Albright's disk herniation was the result of her underlying back problems: "Specifically she had a well-documented history of chronic back pain, previous mechanical episodes." "So my feeling is and my opinion, based on a review of the medical records, is the fact that if this mechanical episode of June 8th, 2010, had not occurred I really don't think that Ms. Albright's clinical course would have changed." Dr. Burton also opined that Albright's underlying degenerative disk disease was not work related.

> [Given] Ms. Albright's radiologic findings, her past history, and the nature of her work, as I understand it, as a forklift operator, it is extremely and highly unlikely that her work had any significant etiologic effect on her long-standing, multilevel, and progressive cervical and lumbar degenerative disk pathology. It is well established that multilevel degenerative disk pathology is primarily related to genomic or hereditary factors. . . . I also understand the fact that an underlying progressive degenerative condition such as this can be influenced by work activities; however, driving a forklift is not considered to be an occupation which is highly physically demanding.

Dr. Burton testified that his 40 years of experience treating patients in various occupations gives him an understanding of how different vocations relate and impact diseases of the spine. Albright argues that Dr. Burton's lack of knowledge of Albright's working conditions, among other factors, make his opinion on this issue weak and unreliable. The ALJ recognized this lack of specific knowledge of Albright's working conditions and factored it into the weight he gave Dr. Burton's opinion.

[¶ 37] In addition to the eight-reason summary for finding Albright's treating doctors' opinions "not consistent with the other substantial evidence in Albright's medical records," the ALJ summarized five reasons he found Dr. Burton's opinion more credible:

1. He reviewed Albright's previous medical history;

2. We know what facts Burton used to support his conclusions;

3. He testified and subjected himself to cross-examination;

4. His opinion was based on a reasonable degree of medical certainty while Eichler's, Olson–Fitzgerald's, and Paape's makes no such claim;

5. He identified his education, training, and expertise and gave reason why his opinion should be provided more weight.

The ALJ's reasons fit under subsections (c), (d), (f), and (g) of N.D.C.C. § 65–05–08.3(1).

[¶ 38] As the ALJ noted in his order denying reconsideration, "[o]f the four medical providers here, only Eichler opined that the event could have been the result of a single event occurrence. If this was not his opinion, he failed to testify to explain away what he wrote. He also later weakened that position, by stating the injury may be the result of years of work." As we have noted before, "[w]hen presented with conflicting expert medical opinions, it is for WSI, not the district court, to weigh credibility and resolve conflicts." *Bruder*, 2009 ND 23, ¶ 9, 761 N.W.2d 588. Now, N.D.C.C. § 65–05–08.3(1) provides WSI an enumerated list of factors to apply and satisfy if it disregards a claimant's favorable medical evidence.

[¶ 39] The ALJ was faced with conflicting medical evidence, and he weighed the evidence and made credibility determinations. In reversing the ALJ, the district

court reweighed evidence and the credibility of the medical opinions, and it substituted its judgment for that of the ALJ. After characterizing Dr. Burton as a "professional witness," the district court found that no reasoning mind could reject the opinions of Albright's treating doctors and "substitute in their place the unfounded opinion expressed by Burton in his deposition testimony." The district court further criticized Dr. Burton by asserting Dr. Burton's report conflicted with his deposition testimony. However, after reviewing Dr. Burton's report and deposition testimony in light of the deference afforded to the ALJ's findings, we are not convinced a reasoning mind must find Dr. Burton changed his opinion. In critiquing the weight the ALJ gave to Dr. Burton's opinion, the district court stated that because Dr. Burton was deposed and did not testify at the hearing, "the ALJ was not in a better position to assess either Burton's credibility or the weight of his testimony." Additionally, though the ALJ found Olson–Fitzgerald's one-page letter unpersuasive, the district court characterized Olson–Fitzgerald's one-page letter as being "short on detail," yet persuasive as it "suggests" a connection between Albright's work duties and her "degenerative changes of the musculoskeletal system."

■■■ [¶ 40] As we have noted before: "It is not the function of the courts . . . to make independent findings or substitute their judgment for that of the agency. . . ." *Bruder*, 2009 ND 23, ¶ 15, 761 N.W.2d 588 (citation omitted). "The function of the court is to determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Id.* Considering our deferential standard, WSI has adequately explained its rationale and reasoning for accepting Dr. Burton's medical opinion and rejecting Albright's treating doctors' opinions.

[¶ 41] We conclude that WSI has satisfied N.D.C.C. § 65–05–08.3 by establishing that Albright's treating doctors' opinions were inconsistent with other substantial record evidence and adequately explained its reasons for disregarding medical evidence favorable to Albright under the statutory test and factors. We conclude that a reasoning mind reasonably could have determined that the factual conclusions reached by the ALJ were proved by the weight of the evidence from the entire record.

## V

■■■ [¶ 42] The district court determined that WSI acted without justification in denying Albright benefits, and it awarded costs and attorney fees to Albright under N.D.C.C. § 28–32–50(1). Under that statute, costs and attorney fees are to be awarded if the claimant prevails and the court determines that the agency acted without substantial justification. Albright is no longer the prevailing party, and the district court erred in determining WSI acted without substantial justification. Consequently, costs and attorney fees are not available under N.D.C.C. § 28–32–50(1).

## VI

[¶ 43] Any remaining issues and arguments not addressed are unnecessary to our decision. The district court judgments are reversed, and the decision of the ALJ affirming WSI's order denying benefits is reinstated.

[¶ 44] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DANIEL J. CROTHERS, JJ., concur.

DALE V. SANDSTROM, J., concurs in the result.