*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
October 8, 2019

v

BRANDON JAMES DUNMIRE,

Defendant-Appellant.

No. 343444
Macomb Circuit Court
LC No. 2017-002222-FC

Before: RIORDAN, P.J., and K. F. KELLY and CAMERON, JJ.

PER CURIAM.

Following a jury trial, defendant Brandon Dunmire was convicted of first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). The trial court sentenced Dunmire to prison terms of life without parole for the murder conviction and 18 to 30 years' for the child abuse conviction. Dunmire appeals his convictions, and we affirm.

## I. FACTUAL BACKGROUND

Dunmire's convictions arise from the death of his three-month-old daughter ("the victim"). The victim died as a result of serious injuries that she sustained while in Dunmire's care on the evening of March 28, 2017. According to the victim's mother, the victim was awake and interacting normally when she left for work on March 28, 2017. At some point that evening, Dunmire called the victim's mother and reported that the victim was not breathing. The victim's mother directed Dunmire to call 911, which he did. When Officers Paul Kulisek and Carla Wexford arrived at Dunmire's residence, Dunmire opened the door and directed them to the victim, who was on the floor near the living room. The officers observed that the victim did not have a pulse and was not breathing. She was also cold and had bruising and abrasions on her body. After chest compressions were administered, a pulse was detected and the victim's breathing and temperature were stabilized. The victim was transported to the hospital by ambulance.

Officers Joseph Duggan and Donald Viars remained at the home with Dunmire following the victim's transport to the hospital. Officer Duggan observed that Dunmire smelled of alcohol and had slurred speech and bloodshot, watery eyes. Dunmire told Officer Duggan that he was

feeding the victim with a bottle when he noticed that she had stopped breathing. Dunmire indicated that he performed cardiopulmonary resuscitation (CPR) on the victim. Later, Dunmire reported that the victim stopped breathing when she was on the floor on a "boppy." Dunmire also stated that he fell asleep on the couch with the victim on top of him and that he fell off the couch. At some point, Officer Duggan took Dunmire to the police station and placed him in an interview room, where Dunmire quickly fell asleep.

At about 1:00 a.m. on March 29, 2017, Detective James Twardesky interviewed Dunmire after reading him *Miranda*[1] warnings. Detective Twardesky noted that Dunmire was not exhibiting any signs of intoxication and that he was able to answer questions coherently. According to Detective Twardesky, Dunmire denied that anyone had snuck into the home to injure the victim, and he denied all the possible ways that the victim could have fallen and hit her head. Dunmire explained that he noticed that the victim was blue and that he forcefully attempted to press her chest to get air into her before he called the victim's mother. Dunmire denied that he had difficulty dealing with the victim's crying or that there was tension in his relationship with the victim's mother. Dunmire told Detective Twardesky that he did not remember how the victim's injuries occurred and that he wished that he had noticed her struggling sooner. Detective Twardesky testified that Dunmire became sarcastic at the end of the interview and asked to leave. Dunmire was arrested.

On March 30, 2017, the victim died. Wayne County Chief Medical Examiner Carl Schmidt, M.D., performed the autopsy. Dr. Schmidt determined that the victim's cause of death was homicide as a result of multiple blunt force traumas. Dr. Schmidt noted that the victim's brain was swollen and bleeding on both sides and that she had a two-inch skull fracture. Given the amount of hemorrhaging, Dr. Schmidt opined that there were 8 to 10 impacts to the victim's head that would have immediately affected her level of consciousness. Dr. Schmidt indicated that each individual impact could have caused the victim's death. Dr. Schmidt also located bruising on the trunk of the victim's body. The fact that there was bruising on the victim's abdomen led Dr. Schmidt to believe that the victim had been held against a wall or placed on the floor before being punched or stomped. Dr. Schmidt also noted multiple rib fractures, bruising on the lungs, and hemorrhaging to the left kidney and thymus gland, which he opined could not have been caused by the administration of CPR. The autopsy revealed that the victim had a broken leg, which Dr. Schmidt believed could have been caused by squeezing the leg or an object contacting the leg with significant force. Dr. Schmidt believed that the victim's leg was broken several days before March 28, 2017. Among other injuries, Dr. Schmidt also noted that the victim had hemorrhaging on the optic nerve sheath and retina and fractured vertebrae.

Dunmire was charged with felony-murder and first-degree child abuse, and Child Protective Services (CPS) was contacted.[2] On April 4, 2017, Amanda Wietecha conducted an

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] CPS was required to investigate because the victim's mother had a two-year-old son who lived with her and Dunmire at the time the victim sustained her fatal injuries. Dunmire is not the father of the two-year-old child.

interview with Dunmire at the Macomb County Jail. According to Wietecha, Dunmire acknowledged becoming frustrated at times with the victim's crying and said that he would put her in a bassinet to let her "cry it out." Dunmire told Wietecha that, on the night she was injured, the victim was in a "bouncer" next to the couch. Dunmire surmised that the victim fell out of the bouncer or that someone entered the home and injured the victim. However, Dunmire indicated that he could not remember and noted that he may have blacked out.

After a jury trial, Dunmire was convicted as charged and was sentenced to terms of imprisonment. This appeal followed.

## II. ANALYSIS

### A. MOTION TO SUPPRESS STATEMENTS TO DETECTIVE TWARDESKY

Dunmire argues that the trial court erred by denying his motion to suppress all of the statements that he made to Detective Twardesky during the March 29, 2017 interview.[3] Specifically, Dunmire contends that Detective Twardesky "trick[ed]" him into making statements by indicating that the *Miranda* warnings did not "mean anything." Dunmire failed to raise this specific argument at the *Walker*[4] hearing or at any time before trial. In fact, Dunmire raised this issue for the first time on appeal, thereby rendering the argument unpreserved. See *People v Manning*, 243 Mich App 615, 625; 624 NW2d 746 (2000) (holding that a motion to suppress an involuntary confession "must be made in advance of trial").

Therefore, we apply the plain-error rule, which requires that "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error has affected a defendant's substantial rights when there is "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* Moreover, "once a defendant satisfies these three requirements, . . . [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763-764 (quotation marks and citation omitted; alteration in original). A defendant bears the burden of persuasion with respect to prejudice. *Id.* at 763.

A statement obtained from a defendant during a custodial interrogation is admissible only if the defendant "voluntarily, knowingly, and intelligently" waived his Fifth Amendment rights.

---

[3] We note that the trial court suppressed the second half of Dunmire's March 29, 2017 statements to Detective Twardesky because Dunmire's invocation of his right to remain silent was not honored. Further, all of Dunmire's March 30, 2017 statements to Detective Twardesky were suppressed because Detective Twardesky did not properly administer *Miranda* warnings before the March 30, 2017 interview commenced and did not honor Dunmire's invocation of his right to remain silent.

[4] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

*Miranda v Arizona,* 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "[C]oercion can be mental as well as physical," and . . . "the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Jackson v Denno,* 378 US 368, 389; 84 S Ct 1774; 12 L Ed 2d 908 (1964) (citation omitted). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v Burbine,* 475 US 412, 421; 106 S Ct 1135; 89 L Ed 2d 410 (1986), citing *Fare v Michael C,* 442 US 707, 725; 99 S Ct 2560; 61 L Ed 2d 197 (1979). The dispositive inquiry is "whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda.*" *Duckworth v Eagan,* 492 US 195, 203; 109 S Ct 2875; 106 L Ed 2d 166 (1989), citing *California v Prysock,* 453 US 355, 361; 101 S Ct 2806; 69 L Ed 2d 696 (1981).

This required inquiry is rooted in the underlying purpose of *Miranda* warnings, which is to mitigate the inherent pressure in police interrogations:

> In order to combat these pressures [inherent in a custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored. [*Miranda*, 384 US at 467.]

The warning that anything the suspect says can be used against him in court serves in substantial part to ensure that the suspect is aware of the seriousness of the situation:

> This warning is needed in order to make him aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest. [*Miranda*, 384 US at 469.]

Thus, circumstances that can be pertinent when weighing the totality of the circumstances concerning the voluntariness of a confession include where technically accurate warnings are conveyed in such a way as to undermine the suspect's "aware[ness] that he is faced with a phase of the adversary system," *id.*, or situations where the warnings are weakened by express implications "that the interrogation will continue until a confession is obtained . . .," *id.* at 468. In our voluntariness inquiry, we must consider the extent to which the *Miranda* warnings— although technically accurate—actually protected against a coerced confession.

In this case, there is no dispute that Detective Twardesky administered *Miranda* warnings before he interviewed Dunmire on March 29, 2017. Dunmire essentially argues on appeal that he did not have the requisite level of comprehension regarding these warnings at the time that he waived them because Detective Twardesky implied that the *Miranda* warnings did not matter, thereby obscuring the meaning of the warnings and rendering his waiver involuntary. More specifically, at the beginning of the interview, Detective Twardesky stated the following: "[T]hey called me in. So, because I—I don't like to mess around, I am going to read you your

rights, okay? It doesn't mean anything, it's just, you're in the police department. It seems like the right thing to do, okay?"

Dunmire suggests that the clear implication of this comment was that he need not take the warnings seriously. However, we are left to speculate as to whether Detective Twardesky's comment actually had this effect on Dunmire at the time of the interview given that Dunmire elected not to testify at the *Walker* hearing. Even if Dunmire had testified, it seems unlikely that he would have testified that Detective Twardesky's comment impacted his decision to waive his rights considering that, at the *Walker* hearing, Dunmire argued only that his waiver was involuntary because he was intoxicated, was sleep deprived, was under stress, and had not had anything to eat for an extended period of time at the time he was interrogated.[5] In fact, Dunmire never argued before the trial court that his waiver was involuntary because the warnings provided to him were rendered ineffective based on Detective Twardesky's now-challenged comment. Indeed, it was the prosecutor—not defense counsel—who elicited this testimony from Detective Twardesky during trial. Detective Twardesky testified that his comment was intended only to explain to Dunmire that just because he was being advised of his *Miranda* warnings did not necessarily mean that he was being accused of a crime or that he ultimately would be charged in connection with the injuries sustained by the victim. We conclude that this is a logical interpretation of Detective Twardesky's comment. Further, given the totality of the circumstances, Dunmire's invocation of his right to remain silent later during the same interview and again the next day undercuts his claim on appeal that he was tricked to believe that *Miranda* warnings did not "mean anything."[6] Accordingly, Dunmire has failed to demonstrate plain error. See *Carines*, 460 Mich at 763.

Moreover, given that the record contains overwhelming evidence of Dunmire's guilt, we fail to see how he would be able to establish that his substantial rights were affected by his statements to Detective Twardesky being admitted into evidence. See *id.*

### B. MOTION TO SUPPRESS STATEMENTS TO WIETECHA

Dunmire argues that the trial court erred by denying his motion to suppress the statements that he made to Wietecha. We disagree.

We review de novo a preserved issue concerning a trial court's ruling on a motion to suppress. *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011). The trial court's factual findings are reviewed for clear error. *People v Elliott*, 494 Mich 292, 300; 833 NW2d

---

[5] On appeal, Dunmire does not argue that his waiver was involuntary because he was intoxicated, was sleep deprived, was under stress, and had not eaten for an extended period of time at the time of the interview. Nonetheless, to the extent that we have considered these arguments, we find that they lack merit.

[6] Dunmire invoked the right to remain silent in an attempt to end the March 29, 2017 interview and to prevent the March 30, 2017 interview.

284 (2013). A factual finding is clearly erroneous if it leaves the Court with a firm and definite conviction that a mistake was made. *Steele*, 292 Mich App at 313.

Dunmire argues that the statements he made to Wietecha during the CPS interview—which was conducted after he was arraigned and lodged at the Macomb County Jail—should have been suppressed because Wietecha failed to administer *Miranda* warnings beforehand. However, "a person who is not a police officer and is not acting in concert with or at the request of the police is not required to give *Miranda* warnings before eliciting a statement." *People v Anderson*, 209 Mich App 527, 533; 531 NW2d 780 (1995), citing *Grand Rapids v Impens*, 414 Mich 667, 673; 327 NW2d 278 (1982). In *People v Porterfield*, 166 Mich App 562, 566; 420 NW2d 853 (1988), this Court considered whether a defendant's statement to a CPS worker "made in the course of a child-neglect proceeding was inadmissible because he was not informed of his *Miranda* rights . . . at the time he made the statement." This Court determined that "although the caseworker was a state employee, she was not charged with enforcement of criminal laws and she was not acting at the behest of the police; therefore, she need not have advised defendant of his *Miranda* rights." *Id*. at 567.

We conclude that Wietecha was not acting in concert with or at the behest of the police. Wietecha testified that she interviewed Dunmire as part of her child abuse investigation. She indicated that she considered the CPS civil proceedings to be focused on the welfare of the child, and she took steps to avoid interfering with the criminal investigation that was occurring simultaneously. Importantly, Wietecha was not given instructions from law enforcement before she interviewed Dunmire. Further, it is clear from the record that Wietecha's investigation was guided by CPS procedures, whereas Detective Twardesky's investigation was guided by police and criminal law procedures. The investigations, while overlapping in subject matter, occurred to further the functions of the respective agencies. Because the record evidence supports that Wietecha was not acting in concert with or at the behest of the police at the time of the interview, we conclude that she was not required to administer *Miranda* warnings before she interviewed Dunmire. See *Porterfield*, 166 Mich App at 567. Consequently, the trial court did not err by denying Dunmire's motion to suppress based on Dunmire's assertions that Wietecha improperly failed to provide him with the required warnings, see *Steele*, 292 Mich App at 313, and we need not consider Dunmire's arguments that MCL 763.8 was violated by Wietecha's failure to record the interview.

Next, Dunmire alleges that the trial court erred by failing to suppress the statements that he made to Wietecha because his Sixth Amendment right to counsel was violated. The Sixth Amendment of the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." US Const, Am VI. The right to counsel guaranteed by the Sixth Amendment applies to "critical stages of the proceedings where counsel's absence might harm [a] defendant's right to a fair trial." *People v Buie*, 298 Mich App 50, 61; 825 NW2d 361 (2012) (internal quotation marks omitted). "The right to counsel attaches and represents a critical stage 'only at or after the initiation of adversary judicial proceedings against the accused by way of a formal charge, preliminary hearing, indictment, information, or arraignment.' " *Id.*, quoting *People v Anderson (After Remand)*, 446 Mich 392, 402; 521 NW2d 538 (1994). Thus, the Sixth Amendment right to counsel is limited to criminal prosecutions.

In this case, Wietecha interviewed Dunmire because CPS policy required that she do so as part of her investigation. Wietecha testified that she informed Dunmire that she was a CPS worker who was investigating the allegations of abuse, and she explained that her investigation was focused on the welfare of the child who remained in the home. As stated above, the record evidence does not support that Wietecha was acting in concert with or at the behest of the police. Rather, Wietecha's investigation was guided by CPS procedures. Thus, because Wietecha's interview with Dunmire was part of a potential petition for protective custody in a civil proceeding, the Sixth Amendment right to counsel guarantee was not applicable.[7] See *Turner v Rodgers*, 564 US 431, 441; 131 S Ct 2507; 180 L Ed 2d 452 (2011) (holding that the "Sixth Amendment does not govern civil cases"); *In re AMB*, 248 Mich App 144, 221-222; 640 NW2d 262 (2001) ("Sixth Amendment right to counsel and the analogous state [constitutional] right to counsel . . . do not apply directly to child protective proceedings because these proceedings are civil, not criminal in nature" and because "the right to counsel in a protective proceeding is statutory, not constitutional."). Therefore, the trial court did not err by denying Dunmire's motion to suppress based on assertions that his Sixth Amendment right to counsel was violated when Wietecha interviewed him after he was arraigned. See *Steele*, 292 Mich App at 313.

Dunmire next argues that his Fifth Amendment right to counsel was violated because Wietecha interviewed him after he unequivocally asserted his right to counsel during previous interviews with Detective Twardesky. The Fifth Amendment right to counsel "is a prophylactic right in the Supreme Court's jurisprudence relating to the Fifth Amendment right against compelled self-incrimination and to due process. . . ." *People v Williams*, 244 Mich App 533, 538; 624 NW2d 575 (2001). "The right to counsel found in the Fifth Amendment is designed to counteract the inherently compelling pressures of custodial interrogation and to secure a person's privilege against self-incrimination by allowing a suspect to elect to converse with the police only through counsel." *Id.* at 539 (quotations and citations omitted). However, these safeguards "apply only when there is a custodial interrogation of a suspect." *Id.* "Generally, a custodial interrogation is a questioning initiated by *law enforcement officers* after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Steele*, 292 Mich App at 316 (emphasis added).

As discussed above, the record evidence supports that Wietecha was not acting in concert with or at the behest of the police at any relevant time. Rather, she was engaging in an investigation pursuant to CPS policies. Because Wietecha's interview of Dunmire did not constitute a custodial interrogation, *Steele*, 292 Mich App at 316, Dunmire's Fifth Amendment right to counsel was not implicated. See *Williams*, 244 Mich App at 539. Consequently, the trial court did not err by denying Dunmire's motion to suppress statements made to Wietecha. See *Steele*, 292 Mich App at 313.

---

[7] According to Wietecha, Dunmire never requested counsel during the CPS interview.

## C. INVADING THE PROVINCE OF THE JURY

Dunmire argues that the trial court improperly permitted Dr. Schmidt to testify about what may have caused the victim's injuries. Whether evidence was properly admitted is reviewed for an abuse of discretion. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595 (2005). A trial court does not abuse its discretion when the court chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

MRE 702, which governs the admissibility of expert testimony, requires a three-part test: "(1) the expert must be qualified; (2) the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue; and (3) the evidence must be from a recognized discipline." *People v Williams (After Remand)*, 198 Mich App 537, 541; 499 NW2d 404 (1993). An expert may offer an opinion at trial if his or her testimony "is based on sufficient facts or data," if the testimony "is the product of reliable principles and methods," and if the witness "has applied the principles and methods reliably to the facts of the case." MRE 702. The trial court must ensure that the expert's testimony is relevant. *People v McFarlane*, 325 Mich App 507, 518; 926 NW2d 339 (2018). Even when an expert's testimony is relevant, it remains subject to the limits imposed by MRE 403. *Id.*

"[E]xpert opinion testimony will not be excluded simply because [the testimony] embraces an ultimate issue to be decided by the trier of fact." *People v Ray*, 191 Mich App 706, 707; 479 NW2d 1 (1991). However, "it is important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion." *People v Drossart*, 99 Mich App 66, 75; 297 NW2d 863 (1980). Where there is no direct evidence of the defendant's intent, the trier of fact may use the opinion of an expert witness to infer the defendant's intent. See *Ray*, 191 Mich App at 708.

In this case, expert medical testimony was required because ordinary persons would not be able to evaluate the medical evidence and assess the nature and extent of the victim's injuries and the possible cause of the injuries. At trial, Dr. Schmidt was qualified as an expert in anatomical, clinical, and forensic pathology. He testified that he could "surmise" from his training and experience and the autopsy results how the victim's injuries occurred. Dr. Schmidt then provided the following testimony:

> I think it is apparent given it was [a] three month[] old child that the child was grabbed by the leg with a force enough to cause a displaced fracture of the tibia at the point. I think it is fair to say that the chest was also sort of forcibly squeezed at some point causing enough point pressure at the level of the 7th and 8th thoracic vertebrae to cause a fracture and dislocation of the rib at that point. I think the injury to the left parietal bone was caused by impact on a hard surface[,] probably an edge[,] because that is how fractures happen in children with bones that are [as] flexible as they are at that age. I think that the child was at some point grabbed by the leg, and perhaps the head swung to strike the surface that caused the fracture of the skull, but that is about as far as I can say.

Dunmire argues that Dr. Schmidt's "unsupported" testimony invaded the province of the jury. We disagree. In *McFarlane*, 325 Mich App at 522-523, this Court recognized the following:

It is necessary for an expert to testify about the types of injuries typically observed with head trauma in children and to describe the possible mechanisms of injury involved. Further, unlike the case with a diagnosis of sexual assault based on the emotional state and statements of the complainant, a diagnosis that a child's head injuries were not accidental may be made on the basis of physical examination and scientific evidence rather than solely on the history provided by the complainant. Accordingly, . . . a physician may properly offer an opinion that, when the medical evidence is considered along with the child's history, the child's injuries were inflicted rather than caused by accident or disease because a jury is unlikely to be able to assess the medical evidence. Expressing an opinion that the trauma was inflicted or not accidental does not impermissibly invade the province of the jury because the expert is not expressing an opinion regarding the defendant's guilt or whether the defendant had a culpable state of mind, which the expert may not do. Instead, the expert is interpreting the medical evidence and offering the opinion that the trauma was caused by human agency, and the jury is free to reject that opinion on the basis of the evidence adduced at trial, including a contrary opinion by another expert. [Citations omitted.]

In this case, Dr. Schmidt described his physical examination of the victim and the victim's injuries in great detail. Based on Dr. Schmidt's interpretation of the medical evidence, he opined that many of the victim's injuries were consistent with particular human actions, such as punching, grabbing, blunt force, or shaking. There was no evidence to suggest that the scientific validity of Dr. Schmidt's opinion was not based on standard methods of pathology. Further, Dr. Schmidt did not impermissibly state his opinion in terms of a legal conclusion, i.e., that the injuries were caused by abuse. Rather, Dr. Schmidt testified that his classification of the injuries did not include a determination of intent and that he could not definitively state how the injuries were caused. Accordingly, we conclude that Dr. Schmidt's expert opinion about the possible causes of the victim's injuries did not improperly interfere with the jury's role of determining Dunmire's intent or culpability. See *McFarlane*, 325 Mich App at 523. Therefore, the trial court's decision to admit Dr. Schmidt's testimony regarding the potential causes of the victim's injuries into evidence did not fall outside the range of reasonable and principled outcomes. See *Babcock*, 469 Mich at 269.

Affirmed.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Thomas C. Cameron